NATIONAL WILDLIFE FEDERATION,
et al.

v.

Anne GORSUCH, in her official capacity
as Administrator of the United States
Environmental Protection Agency, et
al., Idaho Power Company, Montana
Power Company, Puget Sound Power
and Light Company, Eugene Water and
Electric Board, Portland General Elec-
tric Company, Public Utility District No.
1 of Chelan County, Washington, Public
Utility District No. 1 of Douglas County,
Washington, City of Seattle, Depart-
ment of Lighting, City of Tacoma, De-
partment of Public Utilities, Wash-
ington Water Power Company, Appel-
lants

NATIONAL WILDLIFE FEDERATION,
et al.

v.

Anne GORSUCH, in her official capacity
as Administrator of the United States
Environmental Protection Agency, et
al., Northern Colorado Water Conserv-
ancy District, City and County of Den-
ver acting through the Board of Water
Commissioners, City of Colorado
Springs, Southwestern Water Conserva-
tion District, City of Aurora, Board of
Water Works for the City of Pueblo,
Colorado River Water Conservation Dis-
trict, Association of California Water
Agencies, Appellants.

NATIONAL WILDLIFE FEDERATION

v.

Anne GORSUCH, in her official capacity
as Administrator of the United States
Environmental Protection Agency,
American Water Works Association and
National Association of Water Compa-
nies, Appellants.

NATIONAL WILDLIFE FEDERATION

v.

Anne GORSUCH, in her official capacity
as Administrator of the United States

Environmental Protection Agency,
Blachly-Lane Electric Cooperative As-
sociation, Central Electric Cooperative,
Inc., Clearwater Power Company, Co-
lumbia Rural Electric Association, Inc.,
Consumers Power, Inc., Inland Power
& Light Company, Kootenai Electric
Cooperative, Inc., Lane Electric Co-
operative, Inc., Lower Valley Power
& Light, Inc., Public Utility District
No. 1 of Cowlitz County, Washington
Raft River Rural Electric Cooperative,
Inc., Umatilla Electric Cooperative As-
sociation, Benton Rural Electric Associ-
ation, Big Bend Electric Cooperative,
Inc., Coos-Curry Electric Cooperative,
Inc., Lincoln Electric Cooperative, Ap-
pellants.

NATIONAL WILDLIFE FEDERATION

v.

Anne GORSUCH, in her official capacity
as Administrator of the United States
Environmental Protection Agency.

Appeal of NATIONAL WATER
RESOURCES ASSOCIATION.

NATIONAL WILDLIFE FEDERATION

v.

Anne GORSUCH, in her official capacity
as Administrator of the United States
Environmental Protection Agency, Ap-
pellant.

NATIONAL WILDLIFE FEDERATION

v.

Anne GORSUCH, in her official capacity
as Administrator of the United States
Environmental Protection Agency.

Appeal of ALABAMA POWER
COMPANY, et al.

Nos. 82–1335, 82–1337, 82–1351, 82–1352,
82–1353, 82–1354 and 82–1363.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 13, 1982.

Decided Nov. 5, 1982.

158

Peter R. Steenland, Jr., Atty. Dept. of Justice, Washington, D.C., with whom Robert M. Perry, Gen. Counsel, E.P.A., Carol E. Dinkins, Asst. Atty. Gen., Fred R. Disheroon and Nancy B. Firestone, Dept. of Justice, and Alan W. Eckert, E.P.A., Washington, D.C., were on brief, for Anne M. Gorsuch, Administrator, E.P.A., appellant in 82–1354 and cross-appellee in 82–1335, 82–1337, 82–1351, 82–1352, 82–1353 and 82–1363.

Jeffrey H. Howard, with whom James B. Vasile, Robert L. McCarty, Kenneth A. Rubin and Sam Kazman, Washington, D.C., were on brief, for Colorado Water Agencies, et al., appellants in 82–1337, 82–1351 and 82–1353, and cross-appellees in 82–1335, 82–1352, 82–1353, 82–1354 and 82–1363.

Thomas G. Nelson and James C. Tucker, Twin Falls, Idaho, for Nat. Water Resources Ass'n, appellant in 82–1353.

Gerry Levenberg, with whom R. Keith Guthrie, Washington, D.C., was on brief, for Northwest Utilities Group, appellants in 82–1335 and 82–1352, and cross-appellees in 82–1337, 82–1351, 82–1352 and 82–1354.

Turner T. Smith, Jr. and William B. Ellis, Richmond, Va., were on brief, for Alabama Power Co., et al., appellees in 82–1335, 82–1337, 82–1351, 82–1352, 82–1353 and 82–1354.

David G. Burwell, Windsor, Vt., with whom Patrick A. Parenteau, Washington, D.C., was on brief, for Nat. Wildlife Federation, et al., appellees in 82–1335, 82–1337, 82–1351, 82–1352, 82–1353, 82–1354 and 82–1363. Dan Summers, Jefferson City, Mo., also entered an appearance for State of Missouri, appellees in 82–1335 and 82–1337.

Carl Boronkay and Victor E. Gleason, Los Angeles, Cal., were on brief, for Metropolitan Water Dist. of Southern California, amici curiae urging reversal in 82–1335, 82–1337, 82–1351, 82–1352, 82–1353, 82–1354 and 82–1363.

Roger J. Marzulla, Denver, Colo., was on brief, for Mountain States Legal Foundation, et al., amici curiae urging reversal in 82–1335. R. Norman Cramer, Jr., Denver, Colo., also entered an appearance for Mountain States Legal Foundation, et al.

Frederick H. Ritts and Kirk Howard Betts, Washington, D.C., were on brief, for American Public Power Ass'n, amici curiae urging reversal in 82–1335.

Zygmunt J.B. Plater, Newton Centre, Mass., was on brief, for American Rivers Conservation Council, et al., amici curiae urging affirmance in 82–1335, 82–1337, 82–1351, 82–1352, 82–1353, 82–1354 and 82–1363.

Before ROBINSON, Chief Judge, WALD and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The National Wildlife Federation petitioned the district court for a declaration that the Administrator of the Environmental Protection Agency (EPA) has a nondiscretionary duty to require dam operators to apply for pollutant discharge permits under § 402(a) of the Clean Water Act, 33 U.S.C. § 1342(a), and for an order directing her to perform that duty. The district court issued the requested declaration and order, 530 F.Supp. 1291 (D.D.C.1982), from which EPA and the numerous defendant-intervenors (principally electric utilities and water agencies) now appeal. The sole issue is whether certain dam-induced water quality changes constitute the "discharge of a pollutant" as that term is defined in § 502(12)

of the Act, 33 U.S.C. § 1362(12). The Wildlife Federation, joined by plaintiff-intervenor State of Missouri, argues that in light of the remedial purpose of the Act, this phrase should be read broadly enough to cover these dam-induced changes. EPA argues for a narrower reading under which dams would not require discharge permits, but would instead be regulated under state-developed areawide waste treatment management plans pursuant to § 208 of the Act, 33 U.S.C. § 1288. Because we believe that EPA's interpretation is entitled to great deference and that its view of the statute is reasonable, we reverse.

## I. BACKGROUND

### A. Dam-Induced Water Quality Changes

Dams cause a variety of interrelated water quality problems, both in reservoirs and in river water downstream from a dam. The Wildlife Federation claims that five of these problems—low dissolved oxygen, dissolved minerals and nutrients, water temperature changes, sediment release, and supersaturation—require EPA to regulate dams under the § 402 permit program. The district court's opinion, 530 F.Supp. at 1297–1303, describes these problems in detail, and we will only summarize them here.[1]

### 1. Low Dissolved Oxygen

Water released from a reservoir through a dam into downstream water may be low in dissolved oxygen. The river below the dam will remain oxygen-depleted for some distance, although the river will gradually become reaerated through wind mixing as it flows downstream.[2] If the oxygen level is too low, fish cannot survive. Also, a river low in oxygen has limited ability to break down pollutants and other organic matter. Because dissolved oxygen is important both for fish and for breakdown of organic mat-

1. The government does not dispute the district court's statement of the nature of the water quality problems caused by dams. See EPA Brief at 11–14.

2. See Trial Transcript, Nov. 3, 1980, at 36–37 (testimony of Dr. James Whitley); B. Ackerman, S. Rose-Ackerman, J. Sawyer & D. Henderson, The Uncertain Search for Environmental Quality 20 (1974).

ter, it is an important measure of water quality.[3]

Only large storage dams have low dissolved oxygen problems, and then only during warmer months and only when water is released from the lower part of the reservoir.[4] During warm months, deep reservoirs, like deep natural lakes, stratify into a cold, dense lower layer and a warmer, lighter upper layer. The upper layer, called the "epilimnion," is aerated by wind mixing; oxygen is also produced by photosynthesis. Thus, water quality in the upper layer is good. The lower level, called the "hypolimnion," is too deep to be aerated by wind action and light levels are too low to support photosynthesis. Organic decomposition, which consumes oxygen, leads to a continual net depletion of dissolved oxygen. Depletion continues until "fall turnover," when the two layers break up and the reservoir returns to full aeration.[5]

The rate of oxygen depletion depends primarily on the volume of water in the hypolimnion (the more water, the more oxygen is available for decomposition), its temperature (decomposition occurs more slowly in cold water and colder water also contains more dissolved oxygen), and the quantity of organic matter it contains (the more organic matter, the greater the oxygen demands for decomposition). In particular, if the river above the dam is high in plant nutrients or organic waste when it enters the reservoir—whether from pollution or from natural causes—oxygen depletion in the hypolimnion will be severe.[6]

Several techniques can be used to prevent release of oxygen-depleted water. First, for many dams, water can be released from the epilimnion (which occurs automatically for natural lakes). Older dams were built with reservoir outlets at one level only, usually deep in the dam so that the outlet would remain below the surface of the reservoir even in dry years when the reservoir was low. Many newer dams, however, have outlets at several levels, permitting the dam operator to release high-quality epilimnion water. In single-outlet dams, one can aerate the reservoir (by pumping compressed air down to the hypolimnion) or destratify it (by pumping cold water from the hypolimnion to the surface). Alternatively, one can aerate the hypolimnion water as it is released from the reservoir, either by injecting air or by creating turbulence.[7]

The record does not indicate the number of dams for which discharge of low-oxygen water is a significant problem, nor the cost of the various methods of mechanical aeration.[8] But the problem is serious for at least some dams, and the cure is apparently expensive.[9]

3. For a more extended discussion of the relation between dissolved oxygen level and water quality, see B. Ackerman, S. Rose-Ackerman, J. Sawyer & D. Henderson, *supra* note 2, at 18–28.

4. *See* Joint Statement of Material Facts No Longer In Dispute (Part II of the Pretrial Order of Oct. 31, 1980), ¶¶ 13–16, Joint Appendix ("J.A.") at 13, 15–17.

5. *Id.* ¶¶ 15–18, J.A. at 16–18; Environmental Protection Agency, *The Control of Pollution from Hydrographic Modifications* 68–72 (1973) (EPA Doc. No. 403/9–73–017), J.A. at 207, 221–25 [hereinafter cited as *EPA 1973 Dam Report*].

6. Joint Statement of Material Facts, *supra* note 4, ¶¶ 19–20, J.A. at 19–20; *EPA 1973 Dam Report*, *supra* note 5, at 81–82, 87–89, J.A. at 220, 227, 237–39.

7. *EPA 1973 Dam Report*, *supra* note 5, at 95–97, 109–14, J.A. at 245–47, 259–64.

8. The district court found that discharge of low-oxygen water is a "widespread and serious problem." 530 F.Supp. at 1299 (footnote omitted). However, plaintiffs' only expert witness, Dr. Whitley, had personal knowledge of only a small number of dams where release of low-oxygen water was known to be a problem. Deposition of Dr. James Whitley at 25–26 (Aug. 22, 1980). The only quantitative data in the record is an EPA report indicating that in 1977, 15% of water basins in the country experienced some sort of water quality problem caused by dams. Environmental Protection Agency, *National Water Quality Inventory: 1977 Report to Congress* 15–19 (Oct. 1978) (EPA Doc.No. 440/4–78–001), J.A. at 200, 202–06 [hereinafter cited as *EPA 1977 Report to Congress*].

9. *See* Deposition of Dr. James Whitley, *supra* note 8, at 35–38. Dr. Whitley discusses various attempts to cure the low-dissolved-oxygen problem below Table Rock Dam in Missouri. One was air-injection, which required 11 large diesel air pumps, was "not a very cost effective

## 2. Dissolved Minerals and Nutrients

If dissolved oxygen is totally depleted from the hypolimnion, a further problem develops. A number of minerals and plant nutrients, insoluble under normal "aerobic" conditions, are soluble in zero-oxygen "anaerobic" water. These compounds—including iron, manganese, and phosphates—therefore tend to be leached from bottom muds into the reservoir. High concentrations of these minerals and nutrients, released into the downstream river, can harm fish, make the water unpalatable for drinking, and foster undesirable plant growth.[10]

As for low-dissolved oxygen problems generally, whether mineral leaching will occur depends on a number of factors, including reservoir size, water temperature, and the quality of upstream water. In addition, mineral leaching depends on the amount of leachable matter in the reservoir bottom, which in turn depends partly on how old the reservoir is (for an older reservoir, most leachable minerals may have already been leached).[11]

Control of mineral leaching primarily involves destratifying or mechanically aerating the reservoir to prevent the hypolimnion from becoming totally depleted, or else discharging water from the epilimnion. When building a new dam, site preparation (e.g., removing organic soils) can reduce future leaching. Once again, the record reveals neither the number of dams for which mineral leaching is a significant problem nor the cost of cure.

## 3. Temperature Changes

In a thermally stratified reservoir, the lower hypolimnion layer will generally be colder than the upstream river, while the upper epilimnion layer will be warmer. Some species of fish can survive only in warm water; others can survive only in cold water. Thus, cold hypolimnion water, even if fully oxygenated, will harm or kill warm water fish but benefit cold water fish; conversely, warm epilimnion water will harm or kill cold water fish and benefit warm water fish. In some cases, cold water discharges may be desirable—to create a trout fishery, for example.[12] Also, colder water has higher capacity to assimilate wastes, both because decomposition is slower and because oxygen is more soluble in cold water.[13] In short, dams cause *changes* in the temperature of downstream water, and some of the time, but not all of the time, those changes are undesirable.

Changes in the temperature of downstream water can be prevented in dams with multiple outlet levels by release of an appropriate mix of epilimnion and hypolimnion water. For some dams without multiple outlet levels, destratifying the reservoir may be feasible. However, the goal of maintaining downstream water temperature, because it requires a mix of warm and cold water, may conflict with the goal of maintaining downstream oxygen levels, which calls for release of warm epilimnion water.

## 4. Sediment

Generally, large reservoirs act as sediment traps; the water velocity decreases

---

method, and . . . didn't furnish enough oxygen . . . to meet the [water quality] standards." *Id.* at 35. A second was injecting pure oxygen into the intake tubes for the hydroelectric turbines, which met water quality standards but consumed a tank truck of liquid oxygen every three hours when the turbines were operating at full power. *Id.* at 36–38. As a result, that system is now used only in an "emergency." *Id.* at 38.

**10.** *EPA 1973 Dam Report, supra* note 5, at 75–80, J.A. at 214–19.

**11.** *Id.* at 77–78, J.A. at 216–17.

**12.** *See* Trial Transcript, Nov. 3, 1980, at 125–26 (testimony of Dr. James Whitley); Affidavit of Steven Schatzow, Director, EPA Office of Water Regulations and Standards ¶ 12 (Feb. 25, 1982), J.A. at 95, 101 (both noting that release of epilimnion water would not be a desirable solution to the low oxygen problem below Table Rock Dam in Missouri because the warm water would harm trout).

**13.** *See* Environmental Protection Agency, *Impact of Hydrologic Modifications on Water Quality* 41 (1975) (EPA Doc. No. 600/2–75–007), J.A. at 279, 291 [hereinafter cited as *EPA 1975 Dam Report*].

(compared to the upstream river) and sediment settles to the bottom of the reservoir. Thus, water released from the dam will contain less sediment than upstream water. This is generally viewed as an improvement in water quality. However, the river will "tend to restore its equilibrium [sediment] loading by scouring the downstream channel." [14] Also, the reservoir will tend to fill with sediment, which in some cases can require periodic dredging or sluicing. Dredging may temporarily increase sediment load in the reservoir (and hence in the downstream water); sluicing is a deliberate attempt to have the river carry accumulated sediment downstream.[15]

Sediment release can be reduced by careful dredging or by filtering. There is no evidence in the record to suggest that increased sediment is a major problem.[16]

### 5. *Supersaturation*

When water plunges at high velocity from the reservoir into the downstream river, it becomes mixed with air. Depending on the velocity and turbulence of the falling water and the depth of the receiving basin, this can cause downstream water to become "supersaturated"—aerated in excess of normal concentration. Supersaturated water does not harm people and is suitable for most uses, but can be fatal to fish; documented fish kills have occurred at a number of dams.[17]

Supersaturation can be prevented or reduced to non-fatal levels by reducing the turbulence of the falling water (water released from a spillway at the top of a dam is more turbulent than water released through a pipe in the dam), increasing reservoir capacity to reduce the need for spillway releases during flood periods, using a shallow receiving basin below the dam, or constructing spillway deflectors.[18] Supersaturation does not appear at present to be a major problem. The most recent fish kills discussed in the record occurred at Truman Dam in Missouri in 1978 and 1979 while the dam was under construction, and subsequent installation of a spillway deflector has reduced supersaturation to non-fatal levels.[19]

### 6. *Other Water Quality Changes*

Dams also cause numerous other changes in the nation's waters, not directly at issue in this litigation. On the positive side, dams can prevent floods, store drinking and irrigation water, provide a clean source of electric power (thus reducing other sources of pollution), moderate stream flow, and provide recreation opportunities.[20] On the negative side, they can indirectly affect ground water quality and reduce stream flow and hence waste-assimilative capacity.[21] In short, dams affect environmental quality in a large number of ways, both good and bad.

### B. *Legal Issue Presented*

 The issue in this case is one of statutory construction—which if any of the water quality changes caused by dams must be regulated under the National Pollutant Discharge Elimination System (NPDES) established by § 402 of the Clean Water Act, 33 U.S.C. § 1342. Under § 402(a), "the Administrator may, after opportunity for pub-

---

14. *Id.*

15. *Id.* at 11, J.A. at 286 (effects of dredging); EPA Brief at 13–14 (effects of sluicing).

16. Plaintiffs' sole expert witness, Dr. Whitley, did not testify on the severity or prevalence of sediment releases. Defendants' expert, Dr. Simons, testified that dredging was too expensive to be practical for large reservoirs, Trial Transcript, Nov. 4, 1980, at 68–69, 80–81, and that sluicing was rare, *id.* at 83–89.

17. Joint Statement of Material Facts, *supra* note 4, ¶¶ 23–29a, J.A. at 21–22.

18. *Id.* ¶¶ 28–29, J.A. at 22; Deposition of Dr. James Whitley, *supra* note 8, at 71–73.

19. Joint Statement of Material Facts, *supra* note 4, ¶ 28, J.A. at 22.

20. *Id.* ¶¶ 7–12, J.A. at 14–15.

21. *EPA 1973 Dam Report, supra* note 5, at 80–81, J.A. at 219–20 (ground water); *id.* at 84–86, J.A. at 234–36 (waste assimilation).

lic hearing, issue a permit for the discharge of any pollutant." Unless the Administrator issues an NPDES permit, "the discharge of any pollutant by any person [is] unlawful." *Id.* § 301(a), 33 U.S.C. § 1311(a). Section 502(12), 33 U.S.C. § 1362(12), defines the key phrase "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." Thus, for dams to require NPDES permits, five elements must be present: (1) a *pollutant* must be (2) *added* (3) *to navigable waters* (4) *from* (5) a *point source.*

■ The parties agree that a dam can, in some circumstances, be a "point source," [22] and that both the reservoir and the downstream river are "navigable waters" within the statutory meaning whether or not they are navigable in fact.[23] They dispute whether low dissolved oxygen, cold, and supersaturation are "pollutants" and whether any of the disputed water quality problems constitute the "addition" of a pollutant "from" a point source.

■ The Wildlife Federation argues that any adverse change in the quality of reservoir water from its natural state involves a "pollutant" and that release of polluted water through the dam into the downstream river constitutes the "addition" of a pollutant to navigable waters "from" a point source.[24] If this is correct, the Ad-

ministrator has a nondiscretionary duty to regulate dams under § 402.[25]

EPA argues, on the other hand, that for addition of a pollutant from a point source to occur, the point source must *introduce* the pollutant into navigable water from the outside world; dam-caused pollution, in contrast, merely passes through the dam from one body of navigable water (the reservoir) into another (the downstream river).[26] Also, while conceding that all adverse water quality changes are "pollution"— broadly defined in § 502(19), 33 U.S.C. § 1362(19), as "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water"—EPA argues that low dissolved oxygen, cold, and supersaturation are not included in the narrower statutory term "pollutant," defined in § 502(6), 33 U.S.C. § 1362(6) as:

> dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.[27]

In EPA's view, the Act divides the causes and control of water pollution into two categories, *point sources of pollutants* (regulated through the § 402 permit program) and

---

**22.** "Point source" is defined in § 502(14), 33 U.S.C. § 1362(14) as:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged.

The pipes or spillways through which water flows from the reservoir through the dam into the downstream river clearly fall within this definition, and EPA has required NPDES permits for the discharge of grease, oil, or trash through the outlet works of a dam. EPA Brief at 24 n.21.

**23.** "Navigable waters" are defined in § 502(7), 33 U.S.C. § 1362(7) as "the waters of the United States, including the territorial seas." All courts considering the issue have held that navigability in fact is not required. *See, e.g., United States v. Byrd,* 609 F.2d 1204, 1209 (7th Cir.1979) (citing legislative history); *Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 754–55 (9th Cir.

1978); *Natural Resources Defense Council, Inc. v. Callaway,* 392 F.Supp. 685 (D.D.C.1975).

**24.** Wildlife Federation Brief at 16–18.

**25.** If the releases constitute the discharge of a pollutant, the Administrator *must* regulate dams and cannot issue a categorical exemption from the permit requirements. *Natural Resources Defense Council, Inc. v. Costle,* 186 U.S.App.D.C. 147, 568 F.2d 1369 (1977).

The Wildlife Federation has standing to enforce this duty under the citizen suit section of the Act, 33 U.S.C. § 1365(a)(2), which authorizes any person adversely affected to bring suit to require the Administrator "to perform any act or duty . . . which is not discretionary."

**26.** EPA Brief at 19–25; EPA Reply Brief at 4 & n.2.

**27.** EPA Brief at 26–29.

nonpoint sources of pollution (regulated by the states through "areawide waste treatment management plans" under § 208, 33 U.S.C. § 1288). The latter category is defined by exclusion and includes all water quality problems not subject to § 402.[28]

The district court acknowledged that nothing in the Act or its legislative history suggests that Congress thought about the precise issue before us: whether dam-caused pollution should be regulated under the NPDES permit program. 530 F.Supp. at 1303. The court concluded, however, that had Congress considered the matter, it would have included dams in the permit program. To reach this conclusion, it relied principally on Congress' expressed broad goal to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," including an interim goal of fishable and swimmable water by 1983 and total cessation of the "discharge of pollutants" by 1985. Clean Water Act § 101(a), 33 U.S.C. § 1251(a); see 530 F.Supp. at 1304–06.

On the meaning of § 402's requirement of an "addition" of pollutants, the district court believed that neither side's interpretation of the statute was wholly satisfactory. However, it found that EPA's "overly literal and technical" construction was the "more tortured" and was also the reading less consonant with Congress' zero-discharge goal. 530 F.Supp. at 1307. As for the distinction between "pollutant" and "pollution," the court believed that the statutory list of pollutants was not exclusive. While declining to wholly equate "pollutant" and "pollution," it believed that low dissolved oxygen, cold, and supersaturation were all similar enough to listed pollutants to be among "the kinds of pollution [Congress] intended to control through the NPDES program." Id. at 1311. The district court thus ruled in favor of the Wildlife Federation on the meaning of both "addition" and "pollutant." Recognizing that the large number of dams in the country made issuing individual permits impractical,

it ordered EPA to establish "effluent limitations or other performance standards for dams on a categorical, as opposed to a case-by-case basis." Id. at 1314.

In reaching this result, the district court was "not unmindful" of the deference normally accorded to an agency's interpretation of its governing statute. Id. at 1311. However, it believed that "[t]he statutory interpretation involved here does not require scientific expertise" and that EPA's interpretation "runs counter to expressed congressional intent, and is inconsistent with its own implementation of the Act in other contexts." Id. Moreover, EPA had put forward no policy reasons why dams should not be regulated as point sources; rather, "[i]ts entire argument rests upon a dissection of the language of the Act." Id. Therefore, the district court gave EPA only limited deference: "Under these circumstances, EPA's interpretation cannot be accepted merely because it is the agency administering the [Clean Water Act]." Id. at 1312.

In this appeal, EPA and the Wildlife Federation largely repeat the statutory arguments they made below. In addition, EPA argues that the district court failed to give sufficient deference to EPA's interpretation of the Act.

## II. DEFERENCE TO EPA

Because we agree with the district court that neither the language of the Act nor its legislative history conclusively supports either side's interpretation of § 402, we make a threshold inquiry into how much deference to give to EPA's construction. In our view, the district court erred in failing to give enough deference to EPA's construction of the Act. First, as a general rule, courts must give " 'great deference to the interpretation given the statute by the officers or agency charged with its administration.' " EPA v. National Crushed Stone

---

28. See id. at 7–8; Memorandum in Support of Defendant Costle's Motion to Strike Post-Trial Brief at 2, J.A. at 41, 42 ("A 'non-point source'

is nothing more than a pollution problem not involving a discharge from a point source.") (emphasis in original).

*Association,* 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980) (footnote omitted) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)).[29] Here, EPA certainly has responsibility for administering the Act. Indeed, since deference is "ultimately 'a function of Congress' intent,'" *Process Gas Consumers Group v. United States Department of Agriculture,* 694 F.2d 778, 791 (D.C. Cir. 1982) (en banc) (quoting *Constance v. Secretary of Health & Human Services,* 672 F.2d 990, 995 (1st Cir. 1982)), we find it noteworthy that Congress expressly meant EPA to have not only substantial discretion in administering the Act generally, but also at least some

power to define the specific terms "point source" and "pollutant." [30]

Several other factors point to increased deference due to EPA's interpretation. EPA's construction was made contemporaneously with the passage of the Act, and has been consistently adhered to since.[31] Also, construction of the Act is likely to require scientific and technical expertise.[32] Moreover, during a major revision of the Act in 1977, Congress did not object to EPA's characterization of dams as nonpoint sources, although we give only modest weight to this factor since it is not clear that Congress was aware of EPA's interpretation.[33]

**29.** *See also Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981) ("deference should presumptively be afforded" to rulemaking agency); *E.I. du Pont de Nemours & Co. v. Collins,* 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100 (1977); *Kirkhuff v. Nimmo,* 683 F.2d 544, 549 (D.C.Cir. 1982).

**30.** *See* notes 54–55 *infra* and accompanying text.

**31.** Both consistency and contemporaneous construction increase the amount of deference to be given to an agency's interpretation. *See Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978). On consistency, see also *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981). On contemporaneous construction, see also *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 287 n.5, 98 S.Ct. 566, 574 n.5, 54 L.Ed.2d 538 (1978); *id.* at 302, 98 S.Ct. at 581 (Stevens, J., dissenting); *E.I. du Pont de Nemours & Co. v. Collins,* 432 U.S. 46, 55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100 (1981); *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 510 F.2d 692, 706 (1975).

**32.** *See E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 135 n.25, 97 S.Ct. 965, 978 n.25, 51 L.Ed.2d 204 (1977) (noting the need for deference in light of "'the complexity and technical nature of the statutes and the subjects they regulate . . . and EPA's unique experience and expertise'") (quoting *American Meat Inst. v. EPA,* 526 F.2d 442, 450 n.16 (7th Cir.1975)); *Natural Resources Defense Council, Inc. v. United States Envtl. Protection Agency,* 211 U.S.App.D.C. 179, 656 F.2d 768, 774 (1981) ("[w]here the issue [of statutory construction] presented involves questions of scientific ex-

pertise . . . we defer to the Administrator's interpretation").

**33.** Two early EPA reports, *EPA 1973 Dam Report, supra* note 5, and *EPA 1975 Dam Report, supra* note 13, treat dam-caused water problems as nonpoint source pollution. But, so far as the record shows, the first document submitted to Congress that identified dam-caused problems as nonpoint source pollution is *EPA 1977 Report to Congress, supra* note 8, which is dated October, 1978. Nor did EPA officials inform Congress of the agency's views during their testimony on the 1977 amendments. *See Federal Water Pollution Control Act Amendments of 1977: Hearings Before the Subcomm. on Environmental Pollution of the Senate Comm. on Environment and Public Works,* 95th Cong., 1st Sess. 619–65 (1977) (statement of Thomas Jorling, Assistant Administrator for Water and Hazardous Materials, EPA) [hereinafter cited as *1977 Senate Hearings*], *reprinted in* 4 Congressional Research Service, Environmental Policy Division, 95th Cong., 2d Sess., *A Legislative History of the Clean Water Act of 1977,* at 1093–1139 (Comm.Print 1978) [hereinafter cited as *1977 Leg.Hist.*]; *Federal Water Pollution Control Act Amendments: Hearings on H.R. 3199 Before the House Comm. on Public Works and Transportation,* 95th Cong., 1st Sess. 136–216 (1977), *1977 Leg.Hist.* 1399–1472 (statement of Douglas Costle, Administrator, EPA).

On the limited deference due when Congress may have been unaware of the agency's interpretation, see *SEC v. Sloan,* 436 U.S. 103, 121, 98 S.Ct. 1702, 1713, 56 L.Ed.2d 148 (1978) ("We are extremely hesitant to presume general congressional awareness of the Commission's construction based only upon a few isolated statements in the thousands of pages of legislative documents."); *United States v. Rutherford,* 442 U.S. 544, 554 n.10, 99 S.Ct. 2470, 2476 n.10, 61

■ The Wildlife Federation presents several arguments for reduced deference to EPA, none of which we find persuasive. First, it claims that EPA's narrow definitions of "addition" and "pollutant" in the context of dam-caused pollution are inconsistent with its pursuit in other contexts of broad definitions of "point source" and "pollutant."[34] The district court agreed. 530 F.Supp. at 1304, 1311. We, however, find no inconsistency in EPA's taking a broad view of its statutory mandate in some situations and a narrower view here, even though the same statutory terms are involved. The factual contexts in which EPA has broadly construed the scope of the § 402 permit program are too disparate from this one to permit facile comparison. And EPA has never advocated the unlimited definition of "pollutant" urged by the Wildlife Federation, nor the Federation's liberal view of what constitutes an "addition" from a point source.

■ Second, the Wildlife Federation argues that EPA has been inconsistent in switching its position on appeal as to the relevance of § 304(f)(2)(F), 33 U.S.C. § 1314(f)(2)(F), which directs EPA to issue information on methods for controlling "nonpoint" pollution due to "changes in the movement, flow, or circulation of any navigable waters or ground waters, including changes caused by the construction of dams, levees, channels, causeways, or flow diversion facilities." In the district court, EPA claimed that this section was totally irrelevant.[35] In this court, it argues that § 304(f)(2)(F) demonstrates congressional intent that some dam-caused water quality changes should be treated as nonpoint source pollution. However, even if counsel for EPA has rethought its legal argument,[36] EPA has never changed its basic position that dams generally do not require NPDES permits. Thus, any inconsistency in EPA's statutory argument would at most be cause not to defer to the agency on the narrow question of the relevance of § 304(f)(2)(F), not reason to withdraw deference to EPA on its underlying position concerning dams.

■ Third, the Wildlife Federation argues that EPA has never thoroughly considered whether dams require NPDES permits.[37] We agree that the "thoroughness . . . of an agency's reasoning" bears on the proper degree of deference, *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 37, 102

L.Ed.2d 68 (1979); *Zuber v. Allen*, 396 U.S. 168, 185 & n.21, 90 S.Ct. 314, 324 & n.21, 24 L.Ed.2d 345 (1969); *Sierra Club v. EPA*, 176 U.S.App.D.C. 335, 540 F.2d 1114, 1126 (1976), *vacated and remanded on other grounds*, 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 66 (1977).

34. Wildlife Federation Brief at 38–39; *see Natural Resources Defense Council, Inc. v. Costle*, 186 U.S.App.D.C. 147, 568 F.2d 1369, 1382 (1977); *Sierra Club v. Abston Constr. Co.*, 620 F.2d 41 (5th Cir.1980); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir.1979) (all approving broad EPA definition of "point source"); *United States v. Hamel*, 551 F.2d 107, 110 (6th Cir.1977) (gasoline is a pollutant even though not specifically mentioned in the statutory definition).

35. Memorandum in Support of Defendant Costle's Motion to Strike Post-Trial Brief at 1–4, J.A. at 41–44.

36. On consideration of a number of documents explaining EPA's interpretation of § 304(f)(2)(F), it is possible to discern a consistent agency position, overstated on occasion in the course of litigation: the section reflects congressional understanding that some dam-induced water quality problems are nonpoint source pollution (thus it would be improper to treat all dam-induced water problems as point source pollution), but does not indicate which dam-caused problems are nonpoint pollution (thus, the section does not preclude a finding that any particular pollution problem involves a point source of pollutants). *See* EPA Brief at 30–34; EPA Reply Brief at 10–12; Defendants' Joint Post-Trial Brief at 15–16 & n.30, J.A. at 49, 52–53 & n.30; Letter from Fred Disheroon, Attorney for EPA, to Hon. C. Weston Houck, United States District Judge for the District of South Carolina, concerning *South Carolina Wildlife Federation v. Alexander*, Civ. No. 76–2167 (Feb. 21, 1980), J.A. at 131 (*South Carolina* involved the same issues presented in this case, in the context of three specific dams); *cf. United States v. Earth Sciences, Inc.*, 599 F.2d 368, 371–73 (10th Cir.1979) (accepting EPA view that some mining discharges are regulable under § 402 even though "mining activities" are listed as nonpoint source pollution in § 304(f)(2)(B)).

37. Wildlife Federation Brief at 39–41.

S.Ct. 38, 44, 70 L.Ed.2d 23 (1981), but we can find nothing in the record to show that EPA's decision-making process has been inadequate in this instance. At the time of its initial decision to treat dams as nonpoint sources of pollution, EPA was well aware of the water quality problems caused by dams.[38] To be sure, the 1973 letter explaining EPA's decision contains little legal or policy analysis.[39] But EPA was under no legal obligation at that point to fully explain its reasoning; thus, we are not at liberty to conclude that its position, although incompletely explained, was not in fact carefully considered. More important, EPA in 1974 and 1978 considered at length whether to require NPDES permits for dams and adhered to its original position both times.[40] This reconsideration is sufficient evidence of thoroughness to meet the standard for deference.

■ The usual factors, then (regulatory agency, consistency, contemporaneous construction, expertise, congressional acquiescence, thoroughness), generally support giving great deference to EPA's interpretation. The district court, however, justified

reduced deference by its perception that the issue presented in this particular case did not involve scientific expertise and that EPA was relying in its interpretation of the Act not on policy considerations but on narrow dissection of the language of the Act, a task at which courts are equally skilled.

■ Of course, in any particular case, we must look closely at how the general reasons for deference relate to the specific problem of statutory construction at hand. *Wilderness Society v. Morton,* 156 U.S.App.D.C. 121, 479 F.2d 842, 866 (en banc), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973). Thus, EPA's failure to base its position on scientific or policy considerations, if true, would be cause for reduced deference. As we recently noted in denying deference to the Federal Energy Regulatory Commission:

> The underlying logic for deference ... largely depends on ... [whether] the agency['s] ... interpretation may fairly be characterized as being infused with the agency's expertise. In this case, the Commission *concedes* that its reading of the [Natural Gas Policy Act] is not in-

---

**38.** *See* Letter from Alan Kirk, Acting Assistant Administrator for Enforcement and General Counsel, EPA, to S. Leary Jones, Director, Division of Water Quality Control, Tennessee Department of Public Health at 1 (June 23, 1973), J.A. at 114, 114 ("Typically, water quality problems associated with dams are related to depletion of dissolved oxygen, reduction of streamflow and consequent increases in pollutant concentrations below the dam, and similar problems ...."); *EPA 1973 Dam Report, supra* note 5.

**39.** The letter continues:
> [W]ater quality problems associated with dams ... involve water quality effects not resulting from the discharge of pollutants attributable to the dam itself. Accordingly, we do not believe that the discharge from a dam constitutes a "discharge of pollutants" within the meaning of the Federal Water Pollution Control Act.

Letter from Alan Kirk, *supra* note 38, at 1. This analysis, while not wholly conclusory, is hardly comprehensive.

**40.** In 1974, Mr. Kirk solicited comment from EPA's regional offices on a draft interpretation that would have reversed EPA's view that dams generally do not discharge pollutants. Letter from Alan Kirk, Assistant Administrator

for Enforcement and General Counsel, EPA, to Regional Counsels (Aug. 1, 1974), Record item 39, exhibit D. In 1978, in response to the Wildlife Federation's petition for rulemaking, EPA again reassessed its position, at one point announcing to the district court its intent to seek public comment on the matter. *See* Letter from Fred Disheroon, Attorney for EPA, to Hon. Aubrey Robinson, United States District Judge for the District of Columbia, concerning *National Wildlife Federation v. Costle,* No. 79–0915, J.A. at 123. After considering various options, *see* EPA Office of General Counsel, *Action Memorandum on Issuing NPDES Permits to Dams* (1978), Record item 39, exhibit P. EPA decided that its current position was sound and did not solicit public comment.

The trial judge declined to admit the agency documents cited above into evidence after EPA objected to their admission. *See* Trial Transcript, Nov. 4, 1980, at 12–20. However, they are part of the record because they were incorporated in a Wildlife Federation request for admission, Record item 39, in response to which EPA admitted that the documents were true and accurate copies of EPA documents, Record item 48. Therefore, they can properly be noticed on appeal.

formed by notions of . . . policy. Instead, the Commission simply asserts that . . . its hands are tied, no matter how disastrous the implications of its interpretation.

*Process Gas Consumers Group v. United States Department of Agriculture,* 694 F.2d 778, 792 (D.C.Cir.1982) (en banc) (emphasis in original) (footnote omitted).[41] Also, deference is not a unitary concept, to be applied with equal force to all issues in a case. If some issues involve scientific expertise and others do not, the agency will receive greater deference on the issues that do. In short, we must recognize that the standard for deference to an agency's interpretation of its governing statute "defies generalized application and demands, instead, close attention to the nature of the particular problem faced by the agency."[42]

In this case, it is easy to see why the district court concluded that the agency's determination was policy-free. The agency advanced no policy arguments and resisted the Wildlife Federation's attempts to introduce into evidence documents concerning the 1974 and 1978 reconsiderations.[43] Nonetheless, those documents are legitimately part of the record before us, and we cannot ignore their import. They show that EPA's internal reconsiderations did give primary emphasis to the policy implications of the point source-nonpoint source choice; the agency believed that the statute gave it sufficient leeway to change its mind on treating dams as nonpoint sources if policy considerations dictated such a choice.[44] Thus, while we lament EPA's mis-

guided litigating tactics, we must conclude that its interpretation does in fact merit full deference on the basis of agency expertise.

## III. THE REASONABLENESS OF EPA's INTERPRETATION

■ We have concluded that in this case, EPA deserves great deference; with that in mind, we now turn to the core issue of statutory construction. Statutory analysis begins, of course, with the language of the statute. *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981); *SEC v. Falstaff Brewing Corp.,* 203 U.S.App.D.C. 28, 629 F.2d 62, 68, *cert. denied,* 449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471 (1980). In virtually every case, however, it does not end there but continues with a review of the legislative history. Indeed, the Supreme Court has specifically rejected an interpretation of the Clean Water Act based on the statutory language alone:

> To the extent that the Court of Appeals excluded reference to the legislative history of the [Clean Water Act] in discerning its meaning, the court was in error. . . . "[T]here certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' "

*Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 9–10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976) (quoting *United States v. American Trucking Associations,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940)).[45] The district court's

---

**41.** *See also Office of Consumers' Counsel v. Federal Energy Regulatory Comm'n,* 210 U.S. App.D.C. 315, 655 F.2d 1132, 1141 (1980) ("the question of FERC's jurisdiction is a legal issue not implicating any expertise or specialized judgment which FERC possesses in other areas"); *Wilderness Soc'y v. Morton,* 156 U.S. App.D.C. 121, 479 F.2d 842, 866 (en banc), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

**42.** *Natural Resources Defense Council, Inc. v. SEC,* 196 U.S.App.D.C. 124, 606 F.2d 1031, 1050 (1979) (footnote omitted) (discussing "arbitrary and capricious" review but noting in dictum, *id.* at 1050 n.24, that this statement "would ap-

pear to hold true for other standards [of review]").

**43.** *See* Trial Transcript, Nov. 4, 1980, at 12–20.

**44.** *See* Letter from Alan Kirk to Regional Counsels, *supra* note 40; EPA Office of General Counsel, *Action Memorandum on Issuing NPDES Permits to Dams, supra* note 40.

**45.** *See also Watt v. Alaska,* 451 U.S. 259, 266 n. 9, 101 S.Ct. 1673, 1677 n.9, 68 L.Ed.2d 80 (1981) (" '[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to

opinion paid too much attention to the broad stated purposes of the Act, and too little attention to the legislative history that must inform its view of those purposes.

 If we conclude that EPA's interpretation is inconsistent with the language of the Clean Water Act, as interpreted in light of the legislative history, or if it "frustrate[s] the policy that Congress sought to implement," no amount of deference can save it. *Democratic Senatorial Campaign Committee,* 454 U.S. at 32, 102 S.Ct. at 42; *see SEC v. Sloan,* 436 U.S. 103, 118, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978). But if the agency's construction neither contradicts the language of the statute nor frustrates congressional policy, our inquiry is a limited one. The agency's construction must be upheld if, in light of the appropriate degree of deference, it is "sufficiently reasonable," even if it is not "the only reasonable one or even the reading the court would have reached" on its own. *Democratic Senatorial Campaign Committee,* 454 U.S. at 39, 102 S.Ct. at 46; *see Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 75, 87, 95 S.Ct. 1470, 1479, 1485, 43 L.Ed.2d 731 (1975).[46]

Our analysis proceeds in two stages. Section A considers the language and legislative history of the specific substantive provisions of the Act relating to dams; section B then considers the general legislative pur-

poses underlying the Act. We conclude from that analysis that EPA's interpretation of the specific provisions of the Act is reasonable and not inconsistent with the legislative purposes and so must be upheld.

### A. *Specific Substantive Provisions*

To briefly restate the issue before us, dams can release water into the downstream river which is low in dissolved oxygen, contains dissolved minerals and nutrients, is warm or cold, contains excess sediment, or is supersaturated. The statutory question is whether any or all of these conditions constitute the "addition of any pollutant to navigable waters from any point source" so as to require EPA to issue NPDES permits for dams under § 402.

#### 1. *"Pollutant"*

 Low dissolved oxygen, cold, and supersaturation do not plainly fall within the statutory list of pollutants in § 502(6), 33 U.S.C. § 1362(6)—"dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."[47] These dam-induced changes are water *conditions,* not substances added to water. Section 502(6), however, primarily lists substances; "heat" is the only listed water condition.[48] Moreover, the wording

remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.' ") (quoting *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)).

**46.** In one recent case, the Supreme Court apparently adopted an even narrower standard of review—Federal Reserve Board staff opinions construing the Truth in Lending Act were to be upheld unless "demonstrably irrational." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980). But we believe that this standard was meant to apply only to the Truth in Lending Act, for which there was powerful evidence that Congress intended "to treat administrative . . . in-

terpretation [of the Act] as authoritative." *Id.* at 567–68, 100 S.Ct. at 797–98. In the usual case where congressional intent concerning deference to the agency is weaker or less clear, the "sufficiently reasonable" test applies.

**47.** In *South Carolina Wildlife Federation v. Alexander,* No. 76–2167–2, slip op. at 24 (D.S.C. Apr. 26, 1982) (*South Carolina II*), the court found that "low oxygen water . . . fits easily within the scope of a 'chemical waste' of the hydroelectric process." We disagree. While oxygen is a chemical, EPA can reasonably believe that its absence does not constitute a "waste."

**48.** Congress recognized that heat was different in kind than the other listed pollutants. The House bill contained a separate definition for

of § 506(6) makes us cautious in adding new terms to the definition. Congress used restrictive phrasing—"[t]he term 'pollutant' *means* dredged spoil, [etc.]"—rather than the looser phrase "includes," used elsewhere in the Act.[49] As a general rule, " '[a] definition which declares what a term "means" . . . excludes any meaning that is not stated.' " *Colautti v. Franklin,* 439 U.S. 379, 392 n.10, 99 S.Ct. 675, 684 n.10, 58 L.Ed.2d 596 (1979) (quoting C. Sands, *Statutes and Statutory Construction* § 47.07 (4th ed. Supp.1982) ).

■ The Wildlife Federation argues that supersaturation and changes in temperature and oxygen level are indisputably "pollution" as that term is defined in § 502(19), 33 U.S.C. § 1362(19), and that it would be pointless to recognize dam-induced water changes as pollution without treating these same changes as involving a pollutant.[50] The argument has some superficial appeal. The Supreme Court, however, has ruled that certain radioactive materials are not "pollutants" even though they undoubtedly emit "pollution." *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). Moreover, under usual rules of statutory construction, use of two different

terms is presumed to be intentional, *see, e.g., Russell v. Law Enforcement Assistance Administration,* 637 F.2d 354, 356 (5th Cir. 1981), especially when the legislation specially defines both terms. Finally, EPA's policy-oriented explanation for the distinction—that Congress purposely limited the federal NPDES permit program to certain well-recognized pollutants and left control of other water-altering substances or conditions to the states under § 208—is quite plausible.

The legislative history, while not entirely consistent with the statutory language, further suggests that the Act does not require EPA to treat dam-induced water conditions as "pollutants." Prior law (the Refuse Act of 1899, 33 U.S.C. § 407), had required a permit only for *industrial* discharges of "refuse" into navigable waters. The definition of "pollutant" in § 502(6) was designed to add "municipal discharges" to the "basic formula" of the Refuse Act. S.Rep. No. 414, 92d Cong., 1st Sess. 76 (1971) ("S.Rep."), *reprinted in* 2 Congressional Research Service, Environmental Policy Division, 93d Cong., 1st Sess., *A Legislative History of the Water Pollution Control Act Amendments of 1972,* at 1415, 1494 (Comm. Print 1973) ("*1972 Leg.Hist.*") and in 1972

"thermal discharge." H.R. 11,896, 92d Cong., 2d Sess. § 502(17) (1972), *reprinted in* 1 Congressional Research Service, Environmental Policy Division, 93d Cong., 1st Sess., *A Legislative History of the Water Pollution Control Act Amendments of 1972,* at 893, 1071 (Comm. Print 1973) [hereinafter cited as *1972 Leg. Hist.*]. This definition does not appear in the Act as enacted, but Congress did make special provision for thermal discharges in § 316(a), 33 U.S.C. § 1326(a), which permits EPA to relax the § 402 technology-based effluent limits so long as the discharge will not prevent the "propagation of a balanced, indigenous population of shellfish, fish, and wildlife."

49. *See, e.g.,* 33 U.S.C. § 1362(14) " 'point source' means any discernible, confined and discrete conveyance, including but not limited to . . ."); *id.* § 1321(a)(1) (" 'oil' means oil of any kind or in any form, including, but not limited to . . ."); *id.* § 1321(a)(2) (" 'discharge' includes, but is not limited to . . .").

50. Wildlife Federation Brief at 14. There is some weak case support for this view. In

*South Carolina Wildlife Federation v. Alexander,* 457 F.Supp. 118, 125 (D.S.C.1978) (*South Carolina I*), the court supported its conclusion that low dissolved oxygen could possibly be a chemical waste by noting that "no reasonable purpose would be served by admitting pollution while denying the existence of a pollutant." Subsequently, however, the same court found the broad definition of pollution to be only suggestive and "not dispositive of the 'pollutant' question." *South Carolina II, supra* note 47, slip op. at 25. In *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir. 1979), the court stated: "We believe it contravenes the intent of [the Act] and the structure of the statute to exempt from regulation any activity that emits pollution from an identifiable point." *Earth Sciences,* however, involved an admitted toxic pollutant. The court, in deciding that mining activity can involve a "point source," apparently did not focus on the statutory distinction between pollutant and pollution.

U.S.Code Cong. & Ad.News 3668, 3742.[51] Thus, while Congress did not specifically exclude dams from the NPDES program, it expressed neither specific intent to include them nor general intent to equate "pollutant" and "pollution." Also, the broad term "refuse" was replaced with a list of specific items "so that litigable issues are avoided over the question of whether the addition of a particular material is subject to control requirements." *Id.* Needless to say, if "pollutant" was intended to be as all-encompassing as "pollution," there would have been no need to fear litigation over what it included, and hence no need for such a definitional list.[52]

The reasonableness of EPA's distinction between "pollutant" and "pollution" is reinforced by the changes made in conference. Both the Senate and the House had used inclusive phrasing—"[t]he term 'pollutant' means, *but is not limited to,* dredged spoil, ..., and industrial, municipal, agricultural, and *other waste* discharged into water."[53] The conference committee deleted the inclusive phrases "but is not limited to" and "other waste," albeit without explanation. S.Rep. No. 1236 (Conf.Rep.), 92d Cong., 2d Sess. 143–44 (1972), *1972 Leg.Hist.* 281, 326–27, 1972 U.S.Code Cong. & Ad.News 3776, 3821.

 And, while Congress did not intend the term "pollutant" to be all-inclusive, we find, at the same time, strong signals in the legislative history that it also entrusted

EPA with at least some discretion over which "pollutants" and sources of pollutants were to be regulated under the NPDES program. Of course, Congress generally intended that EPA would exercise substantial discretion in interpreting the Act. As the Conference Report states:

> In the administration of the Act, EPA will be required to establish numerous guidelines, standards and limitations.... [T]he Act provides Congressional guidance to the Administrator in as much detail as could be contrived. Virtually every action required of the Administrator by the Act, however, involves some degree of agency discretion, judgments involving a complex balancing of factors that include technological considerations, economic considerations, and others.

*Id.* at 149, *1972 Leg.Hist.* 332, 1972 U.S. Code Cong. & Admin.News at 3826. It also specifically expected EPA to have some power to determine both what is a "point source" and what is a "pollutant." Senator Muskie, the principal sponsor of the Act, stated:

> Guidance with respect to the identification of "point sources" and "nonpoint sources," especially as related to agriculture, will be provided in regulations and guidelines of the Administrator.

117 Cong.Rec. 38,816 (1971), *1972 Leg.Hist.* 1299.[54] Similarly, with regard to "pollutant," Senator Muskie stated:

> In order to fully understand [the Act], it is necessary to recognize that certain terms ... have very specific and technical meanings. The definitions of these terms are included in section 502 of title V, and it is recommended that very special attention be accorded section 502.... [S]ome of the more important terms ... [are] "pollution" ..., "pollutant" ..., "discharge of a pollutant" ..., "thermal discharge" ..., "discharge," ... [and] "point source" ....

---

**51.** This statement in the Senate Report is inaccurate since the 1972 Act also added such items as "agricultural waste," "munitions," "rock," and "sand" to the definition of "pollutant." We rely on it only to indicate that Congress did not affirmatively intend "pollutant" to be all-inclusive.

**52.** Again, the text of the definition cannot be fully reconciled with the legislative history. The Act defines "pollutant" to include "industrial, municipal, and agricultural waste," itself an imprecise and therefore litigable term.
 The House Report is of little help in determining how inclusive Congress meant the term "pollutant" to be. It stresses the importance of the definitions in general but does not discuss the substance of particular defined terms. *See* H.R.Rep. No. 911, 92d Cong., 2d Sess. 75–76 (1972), *1972 Leg.Hist.* 753, 762–63 [hereinafter cited as H.R.Rep.]:

**53.** H.R. 11,896, 92d Cong., 2d Sess. § 502(6) (1972), *1972 Leg.Hist.* 893, 1068 (emphasis added); *see* S. 2770, 92d Cong., 1st Sess. § 502(f) (1971), *1972 Leg.Hist.* 1534, 1697.

**54.** This court has stated that "the power to define point and nonpoint sources is vested in EPA." *Natural Resources Defense Council,*

Again, I do not get into the business of defining or applying these definitions to particular kinds of pollutants. That is an administrative decision to be made by the Administrator. Sometimes a particular kind of matter is a pollutant in one circumstance, and not in another.

117 Cong.Rec. 38,838 (1971), *1972 Leg.Hist.* 1347.[55]

■■■ Given this focused legislative intent concerning deference to EPA's interpretation of these definitional provisions, we must accept that interpretation unless it is manifestly unreasonable. *See Lead Industries Association v. EPA,* 208 U.S.App.D.C. 1, 647 F.2d 1130, 1147, *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980) (where a statute vests an agency with "a considerable amount of discretion," its interpretation must be upheld unless "plainly unreasonable"). In fact, EPA has given the statute a natural reading, both on its face and in light of the legislative history. We will consider in the next section whether, as

the district court found, EPA's reading is inconsistent with general congressional purposes; however, after the foregoing analysis, it will take powerful evidence to convince us that EPA's conclusion that low dissolved oxygen, cold, and supersaturation are not pollutants is unreasonable.[56]

2. *"Addition" of a Pollutant "from" a Point Source*

■■■ The Act does not define what constitutes the "addition" of a pollutant. The parties agree that water quality problems that occur within a reservoir (*e.g.,* dissolved minerals) are nonpoint pollution, for lack of a point source. The Wildlife Federation argues, however, that the statutorily necessary "addition ... from a point source" occurs when (1) a dam causes pollutants to enter the reservoir and (2) the polluted water subsequently passes through the dam—the point source—into the formerly unpolluted river below.[57] EPA re-

*Inc. v. Costle,* 186 U.S.App.D.C. 147, 568 F.2d 1369, 1382 (1977) (dictum).

55. *See also* 117 Cong.Rec. 38,817 (1971), *1972 Leg.Hist.* 1301 (question by Sen. Buckley, response by Sen. Eagleton) (EPA to publish "criteria which will define natural chemical, physical, and biological integrity" of water).

56. We do not decide in this case whether the statutory list necessarily excludes low dissolved oxygen, cold, and supersaturation, only whether EPA can reasonably so interpret it. Several factors suggest that the list does not necessarily exclude unlisted water conditions. The list includes one condition—heat. Also, one court has found that a substance—gasoline—is a pollutant even though it was not clearly listed. *United States v. Hamel,* 551 F.2d 107, 110–11 (6th Cir.1977). And EPA admits that "sediment" is a pollutant, although not clearly listed. Moreover, the haphazard nature of the listed pollutants, as specific as "cellar dirt" (but *not* "dirt" as such) and as general as "industrial, municipal, and agricultural wastes," together with places in the statute where Congress did not pay careful attention to its own definition, makes us reluctant to conclude that Congress intended to preclude EPA from adding unlisted items to the definition. *See* 33 U.S.C. § 1314(a)(4) (instructing the Administrator to identify "pollutants classified as biological oxygen demanding, suspended solids, fecal coliform, and pH"—which are not pollutants as such, but parameters for measuring pollution); *compare id.* § 1314(f)(1) (EPA must

develop for the states "guidelines for identifying ... [a list of] nonpoint sources of *pollutants"*) *with id.* § 1288(b)(2)(F)–(I) (the states must "identify ... [a similar list of] nonpoint sources of *pollution"*) (emphasis added).

Finally, we can imagine circumstances where EPA might want to treat low dissolved oxygen as a pollutant. Suppose an industrial facility, rather than discharging oxygen-demanding organic waste directly into a river, instead diverts river water, discharges the organic waste into the diverted water, waits for the waste to decompose, and then returns the oxygen-depleted water to the river. The effect on downstream water quality is the same either way; thus, we hesitate to conclude that the Act requires EPA to issue a discharge permit for the former method of waste disposal but bars EPA from regulating the latter method.

57. Wildlife Federation Brief at 17. The district court agreed. 530 F.Supp. at 1306–07. Both elements must be present. Without causation, there is no legal responsibility for removing pollutants from the water. *Appalachian Power Co. v. Train,* 545 F.2d 1351, 1377 (4th Cir. 1976).

Low dissolved oxygen and dissolved minerals involve multiple causation: oxygen depletion in the hypolimnion layer of the reservoir depends on both the characteristics of the reservoir and the amount of pollution in the water entering the reservoir. *See* note 6 *supra* and accompanying text. EPA argues, relying on *Appalachi-*

sponds that addition from a point source occurs only if the point source itself physically introduces a pollutant into water from the outside world. In its view, the point or nonpoint character of pollution is established when the pollutant first enters navigable water, and does not change when the polluted water later passes through the dam from one body of navigable water (the reservoir) to another (the downstream river). As for supersaturation, which does not exist in the reservoir, EPA argues that it occurs downstream, *after* the water is released from the dam.[58]

In our view, the language of the statute permits either construction. The legislative history does not provide much help either. Throughout its consideration of the Act, Congress' focus was on traditional industrial and municipal wastes; it never considered how to regulate facilities such as dams which indirectly cause pollutants to enter navigable upstream water and then convey these polluted waters downstream. Congress did consider *downstream* water changes caused by dams such as saltwater intrusion, *see* § 304(f)(2)(E), 33 U.S.C. § 1314(f)(2)(E), but had no occasion to consider whether NPDES permits were desirable for dams because downstream changes are not amenable to the technological controls required for point sources.

Although Congress did not expressly address whether EPA should have discretion to define the term "addition," we note that it gave the agency reasonable discretion to define two other necessary components of the § 402 permit program—"point source" and "pollutant." On that basis, we consider it likely that Congress would have given EPA similar discretion to define "addition" had it expected the meaning of the term to be disputed. Therefore, EPA's interpretation must be accepted unless manifestly unreasonable, and we do not find it so. *Accord Missouri* ex rel. *Ashcroft v. Department of the Army,* 672 F.2d 1297, 1304 (8th Cir.1982) ("[T]he discharge of a pollutant requires an 'addition' of a pollutant from a 'point source' and neither term applie[s] to soil erosion or the oxygen content of the water.").

### 3. The Primacy of § 402 in the Legislative Scheme

The Wildlife Federation also argues that the definitions of "pollutant" and "addition" should be read broadly because the NPDES permit program is Congress' preferred method of water pollution control and would have been applied to all sources of pollution had Congress thought that it was technologically feasible to do so.[59] There is indeed some basis in the legislative

---

*an Power,* that it cannot require a dam operator to remove pollution that occurs within the reservoir but would not exist except for preexisting upstream pollution. EPA Brief at 23–25. *Appalachian Power,* however, merely held that EPA could not order a polluter to remove preexisting pollution that the polluter had *no* responsibility for. Since we conclude that EPA does not have to issue NPDES permits for dam-caused pollution, we do not reach the question whether EPA can order removal of all pollutants for which the dam is a but-for cause, irrespective of other but-for causes.

**58.** EPA Brief at 20; EPA Reply Brief at 3–5; *accord South Carolina II, supra* note 47, slip op. at 27–28. EPA also argues that any addition must occur "from" a point source and not merely through a point source. EPA Reply Brief at 4 n.3. This argument, however, is inconsistent with its own regulations, which define "discharge of a pollutant" to include "surface runoff which is collected or channelled by man." 40 C.F.R. § 122.3 (1981). Thus, EPA regulates the channel as a point

source even though pollutants merely pass through it from land to navigable water. *See also id.* § 122.57 (treating storm sewers as point sources); *Sierra Club v. Abston Constr. Co.,* 620 F.2d 41, 47 (5th Cir.1980) (surface runoff from rainfall, if collected and channeled by coal miners for their own purposes, is point source pollution); *United States v. Earth Sciences, Inc.,* 599 F.2d 368 (10th Cir.1979).

**59.** Wildlife Federation Brief at 3–5, 24. The district court agreed. 530 F.Supp. at 1304 ("it appears that Congress would have put all pollution sources under [the NPDES] program had it been feasible" to do so). Case support for this view can be found in *Natural Resources Defense Council, Inc. v. Costle,* 186 U.S.App. D.C. 147, 568 F.2d 1369, 1374 (1977) (NPDES program "is central to the enforcement of the [Act]") and *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir.1979) ("Congress would have regulated so-called nonpoint sources if a workable method could have been derived").

history for the position that Congress viewed the NPDES program as its most effective weapon against pollution. Prior to 1972, federal water pollution law had required the states, under EPA oversight, to develop water quality standards and then limit industrial and municipal discharges so as to meet those standards. This system proved inadequate. It was costly, slow, and complicated to determine the effluent limits needed to maintain water quality. Many states did not set effluent limits and enforcement was all but nonexistent.[60] The 1972 Act made technology-based effluent limits, rather than water quality standards, "the basis of pollution prevention and elimination" because they were "the best available mechanism to control water pollution." S.Rep. at 8, *1972 Leg.Hist.* 1426, 1972 U.S. Code Cong. & Ad.News at 3675.[61]

Nonetheless, it does not appear that Congress wanted to apply the NPDES system wherever feasible. Had it wanted to do so, it could easily have chosen suitable language, *e.g.,* "all pollution released through a point source." Instead, as we have seen, the NPDES system was limited to "addition" of "pollutants" "from" a point source.

The legislative history of the 1977 amendments further bolsters the view that the division of pollution control efforts between discharge permits under § 402 and areawide waste management plans under § 208 was not just a device for separating out pollution sources amenable to NPDES technological controls. Rather, Congress viewed state pollution control programs under § 208 as in part an "experiment" in the effectiveness of state regulation. *See* S.Rep. No. 370, 95th Cong., 1st Sess. 8–9, *1977 Leg.Hist.* 635, 642–43 ("1977 S.Rep.") 1977 U.S. Code Cong. & Ad.News, 4326, 4334–35:

In 1972, the Congress made a clear and precise distinction between point sources, which would be subject to direct Federal regulation, and nonpoint sources, control of which was *specifically reserved* to State and local governments through the section 208 process.

. . . .

Between requiring regulatory authority for nonpoint sources, or continuing the section 208 *experiment,* the committee chose the latter course, judging that these matters were appropriately left to the level of government closest to the sources of the problem.

The Senate Report also expresses a positive intent to leave certain pollution problems to the states, at least for the time being:

Section 208 . . . may not be adequate. It may be that the States will be reluctant to develop [adequate] control measures . . . and it may be that some time in the future a Federal presence can be justified and afforded.

But for the moment, it is both necessary and appropriate to make a distinction as to the kinds of activities that are to be regulated by the Federal Government and the kinds of activities which are to be subject to some measure of local control.

*Id.* at 10, *1977 Leg.Hist.* 644, 1977 U.S. Code Cong. & Ad.News at 4336. Consistent with this view of its intent to give the states a chance to show that they could do the job, we note that Congress chose to exempt irrigation return flows from the NPDES program even though they were amenable to point source control. Clean Water Act of 1977, § 33(c), 33 U.S.C. § 1342(*l*); *see Natural Resources Defense Council, Inc. v. Costle,* 186 U.S.App.D.C. 147, 568 F.2d 1369, 1372–73 (1977) (discussing prior NPDES permit requirements for irrigation return flows).

In short, the admittedly important place of the NPDES permit program in the Clean

---

60. For an overview of the weaknesses of prior law and the major changes introduced in the Clean Water Act, see *EPA v. California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 202–05, 96 S.Ct. 2022, 2023–25, 48 L.Ed.2d 578 (1976); S.Rep. at 1–10, *1972 Leg.Hist.* 1419–28, 1972 U.S. Code Cong. & Ad.News at 3668–77.

61. For further cites to the legislative history, see the district court opinion, 530 F.Supp. at 1304 n.56.

Water Act does not convince us that EPA's interpretation of its scope, as far as dam-caused pollution is concerned, is unreasonable.[62]

### 4. *Provisions Specifically Referring to Dams*

Several other sections of the statute refer specifically to dams. To the very limited extent that these sections are relevant, they support EPA and hence reinforce our conclusion that EPA's position is reasonable. In particular, EPA relies on § 304(f)(2)(F), 33 U.S.C. § 1314(f)(2)(F), which requires it to develop:

> processes, procedures, and methods to control [nonpoint source] pollution resulting from—
>
> . . . .
>
> (F) changes in the movement, flow, or circulation of any navigable waters or ground waters, including changes caused by the construction of dams, levees, channels, causeways, or flow diversion facilities.

In its view, this section demonstrates congressional intent that some water quality changes caused by dams be regulated as nonpoint pollution.[63] But even under the Wildlife Federation's reading, downstream bank erosion due to decreased sediment load or variable water releases, saltwater intrusion due to reduced flow, and pollution of the reservoir itself would be nonpoint source pollution.[64] Thus, Congress' mention of dam-induced changes in § 304 as nonpoint source pollution provides only mild support for EPA's position since some dam-caused water quality changes will be treated as nonpoint pollution in any event.

Even less relevant are the references to dams in § 404 (dredge and fill permits re-

quired for, among other things, construction of new dams) and § 102(b) (use of dams to regulate streamflow). That Congress created a special section to deal with dredge and fill problems caused by dams as well as many other construction activities tells us little about what it would have done about the dam-caused problems at issue here, had it focused on them. Similarly, because it affirmatively recognized one beneficial water quality effect of dams in § 102(b) does not tell us what it would have wanted to do about other, harmful effects of dams.

### B. *The Purposes of the Act*

We conclude, then, on the basis of the text and history of the Act, that EPA's construction of relevant substantive provisions is reasonable. We consider next the Wildlife Federation's argument, accepted by the district court, that EPA's construction nonetheless will plainly frustrate the general congressional purposes underlying the Act. We find that it does not.

### 1. *The Text of the "Purposes" Section*

The district court, in giving "pollutant" and "addition" a broad reading, relied heavily on the "purposes" section of the Act, § 101(a), 33 U.S.C. § 1251(a). That section declares (emphasis added):

> The objective of this [Act] is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this [Act]—
>
> (1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

---

**62.** Also, a necessary predicate to the Wildlife Federation's argument is its belief that dam-caused pollution is in fact amenable to point source controls. EPA argues, however, that dams may not be amenable to the nationally uniform controls contemplated by § 402 because pollution problems are highly site-specific, and its expert judgment on such matters must be given great weight. EPA Brief at 37–39; Affidavit of Steven Schatzow, *supra* note 12, ¶¶ 10–12, J.A. at 99–101.

**63.** EPA Brief at 30–34; see notes 35–36 *supra* and accompanying text for our attempt to decipher EPA's argument.

**64.** Wildlife Federation Brief at 17. The contrary statement in *South Carolina II, supra* note 47, slip op. at 31, relied on by EPA, must be rejected as factually incorrect.

(2) it is the national goal that wherever attainable, an interim goal of [fishable and swimmable] water be achieved by July 1, 1983;

(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited . . . .

Undeniably, Congress' strong statement of its objective must color EPA's and our interpretation of specific provisions of the Act. But, as any student of the legislative process soon learns, it is one thing for Congress to announce a grand goal, and quite another for it to mandate full implementation of that goal. Read as a whole, the Clean Water Act shows not only Congress' determined effort to clean up our polluted lakes and rivers, but also its practical recognition of the economic, technological, and political limits on total elimination of all pollution from all sources. The Act contains numerous requirements that cost be taken into account in establishing effluent limits,[65] as well as assorted exemptions from those limits.[66] Moreover, the purposes section, in its own right, suggests that Congress recognized that the substantive provisions of the Act fall short of completely achieving the announced goals of the Act. Congress hedged the purposes section by making it apply only as "consistent with the provisions of this [Act]," and explicitly distinguished between the congressional "policy" to eliminate discharge of toxic pollutants and the presumably weaker "goal" of eliminating discharge of all pollutants.

 Moreover, even if we accept the purposes section at face value, it is only suggestive, not dispositive of whether EPA must issue NPDES permits for dams. Caution is always advisable in relying on a general declaration of purpose to alter the apparent meaning of a specific provision. Here, Congress' expressed goal to eliminate "the discharge of pollutants" does not necessarily require that we expansively construe the term "pollutant," which Congress itself specifically defined. As for the interim goal of fishable and swimmable water, the purposes section does not tell us how that goal is to be achieved. And Congress, although recognizing the weaknesses of past state water pollution efforts, explicitly chose not to completely federalize water pollution control, but instead directed the states to establish their own pollution control programs under EPA oversight. Had it considered the matter, Congress might well have decided that dam-caused pollution was a problem best addressed through state programs.

 In addition to our general doubts, expressed above, about how heavily to rely on the broad goals of the Act, we find specific indication in the Act that Congress did not want to interfere any more than necessary with state water management, of which dams are an important component. Section 101(g), 33 U.S.C. § 1251(g), states:

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated, or otherwise impaired by this [Act].

---

**65.** *E.g.,* 33 U.S.C. §§ 1311(b)(2)(A) ("best available technology economically achievable" for toxic pollutants), 1311(b)(2)(E) ("best conventional pollution control technology" for "conventional" pollutants); *see* B. Ackerman, S. Rose-Ackerman, J. Sawyer & D. Henderson, *supra* note 2, at 319 ("A thorough reading of the Act . . . makes it apparent that the legislators were unwilling to accept the enormous social costs which [the zero-discharge] position, if taken seriously, would entail.") (footnote omitted).

Congress' concern with costs was undoubtedly enhanced by the need to obtain enough votes to override President Nixon's veto, which was based on the "unconscionable $24 billion price tag." Message from the President Returning Without Approval the Bill (S. 2770) Entitled "The Federal Water Pollution Control Act Amendments of 1972," at 1 (Oct. 17, 1972), *1972 Leg.Hist.* 137, 137.

**66.** *E.g.,* 33 U.S.C. §§ 1342(*l*) (exempting "return flows from irrigated agriculture" from the NPDES permit program), 1344(f)(1) (exempting certain discharges of dredged or fill material from NPDES permit requirements), 1362(6) ("sewage from vessels" is not to be treated as a "pollutant").

In light of its intent to minimize federal control over state decisions on water *quantity,* Congress might also, if confronted with the issue, have decided to leave control of dams insofar as they affect water *quality* to the states. Such a policy would reduce federal/state friction and would permit states to develop integrated water management plans that address both quality and quantity. *See* H.R.Rep., *supra* note 52, at 96, *1972 Leg.Hist.* 783 (In some states, "water resource development agencies are responsible for allocation of stream flow and are required to give full consideration to the effects on water quality"; those states "should continue to exercise the primary responsibility in both of these areas and thus provide a balanced management control system.").[67]

### 2. The Legislative History of the "Purposes" Section

In short, based on the text of the Act, EPA's interpretation cannot be said to plainly frustrate congressional purposes. Our review of the history of the 1972 Act and the 1977 amendments also leaves us unsure what Congress would have decided to do about dam-caused pollution if it had focused on the issue. Congress might have regulated dams under § 402 (as the Wildlife Federation desires), or under § 208 (as EPA has done), or even under an entirely new section specifically crafted to deal with dams.

On the one hand, the sponsors of the Act successfully insisted on a zero-discharge-of-pollutants goal despite strong objection from both within and without. The Senate took the stronger course; Senator Muskie, the Senate sponsor and principal force behind the bill, stated, in the post-conference debate on the bill:

These [goals] are not merely the pious declarations that Congress so often makes in passing its laws; on the contrary, this is literally a life or death proposition for the nation.

118 Cong.Rec. 33,693 (1972), *1972 Leg.Hist.* 164.[68] But Senator Muskie also clarified that the zero-discharge-of-pollutants goal was not a legal command:

[T]he 1985 deadline for achieving no discharge of pollutants is a policy objective. It is not locked in concrete. It is not enforceable. It simply establishes what the committee thinks ought to be done on the basis of present knowledge.

---

**67.** Section 101(g) was not intended to take precedence over "legitimate and necessary water quality considerations." 123 Cong.Rec. 39,212 (1977), *1977 Leg.Hist.* 532 (statement of Sen. Wallop, the sponsor of the amendment that added § 101(g)). However, with respect to one area where quality and quantity are in conflict—salt-water intrusion caused by water diversion for drinking or irrigation—Congress explicitly declined to require the states to control water quality. Section 208(b)(2)(F)–(H), 33 U.S.C. § 1288(b)(2)(F)–(H) requires state area-wide waste management plans to set forth "procedures and methods . . . to control to the extent feasible" agricultural, silvicultural, mine-related, and construction-related nonpoint sources. In contrast, § 208(b)(2)(I) requires the state plan merely to "set forth procedures and methods to control [salt water] intrusion to the extent feasible *where such procedures and methods are otherwise a part of the waste treatment management plan.*" (Emphasis added.) The italicized clause, not present in earlier versions of the bill, *see, e.g.,* S. 2770, 92d Cong., 1st Sess. § 209(b)(2)(I) (1971), *1972 Leg.Hist.* 1597–98, was intended to prevent water quality goals from interfering with state water alloca-

tion plans. See the House debate, in which Representative Waldie comments: "I have to conclude that this was a major weakening of this bill and that it was done at the request of someone who does not desire to have salt water intrusion . . . controlled in the bill"; and Representative Johnson explains that the change reflects the concern of the California State Water Resources Board that it "was losing control of its water resources programs." 117 Cong.Rec. 10,256 (1971), *1972 Leg.Hist.* 484–85.

**68.** *See also* 118 Cong.Rec. 36,873 (1972), *1972 Leg.Hist.* 120 (statement of Sen. Muskie during debate on overriding the President's veto of the bill as too costly); *id.* at 33,712, *1972 Leg.Hist.* 208–09 (statement of Sen. Tunney). For discussion of the controversy over the zero-discharge goal, see, *e.g., The Stormy Debate Over "Zero Discharge,"* Bus. Week, Feb. 5, 1972, at 70, *1972 Leg.Hist.* 703; 118 Cong.Rec. 10,788 (1972), *1972 Leg.Hist.* 709–10 (statement of Rep. Dingell) (quoting letter from National Ass'n of Manufacturers opposing writing the goal into law).

117 Cong.Rec. 38,800 (1971), *1972 Leg.Hist.* 1262.[69] And he recognized that zero discharge might ultimately prove to be too expensive to be achieved. *See id.* at 38,822, *1972 Leg.Hist.* 1308–09 (statement of Sen. Muskie):

> There are no [cost] estimates . . . that, in my judgment, have any validity. . . . [T]he 1985 target has not been related to costs. The bill does provide for water quality inventories . . . designed to give us some hard estimates as to the cost of achieving no pollution discharge by 1985 . . . . Then it would be for Congress to decide whether achieving no discharge by 1985 is within the ability of the American people to absorb the cost.

*See also* S.Rep. at 11, *1972 Leg.Hist.* 1429, 1972 U.S. Code Cong. & Ad.News at 3678:

> The Committee recognizes the difficulty of implementing a no-discharge policy. The development of the midcourse correction information required by Section 305 . . . will assist the Nation in any decision on the proper enforcement mechanism to be established to support the goal, if appropriate, . . . or the extent of the exceptions to that goal, if any, or whether the costs associated with reaching this ultimate standard, in some instances, may far outweigh the benefits derived.

Significantly, the Senate's commitment to a zero-discharge policy, qualified though it was, was not fully shared by the House.

What started out as a national "policy" in the Senate bill [70] was watered down to a "goal" in the House. Furthermore, the House, after extensive debate, made both the zero-discharge goal and the best available technology requirement purely hortatory—they were not to take effect unless adopted by a subsequent Congress after an expert commission reported back to Congress on the costs and benefits of stringent water pollution control.[71] While this position was rejected in conference, it suggests the House's strong reservations about the economic and technical feasibility of zero discharge. Those same reservations also led the House to set up the expert commission just referred to to study the "total economic, social, and environmental effects of achieving or not achieving the [best available technology] effluent limitations and goals set forth for 1983." Clean Water Act § 315(a), 33 U.S.C. § 1325(a). The House Report states:

> The Committee recognizes the problems associated with implementing a no-discharge policy. . . . [V]ery little hard evidence was available on which to make final irretrievable judgment on this matter. It was for this reason that the legislation includes section 315 providing for a study . . . of the effects of achieving or not achieving the [1983] goals. At the conclusion of the study . . . , Congress will

---

**69.** *See also, e.g.,* 117 Cong.Rec. 38,820 (1971), *1972 Leg.Hist.* 1304 (statement of Sen. Cooper) ("I believe it would be a misinterpretation to view this bill as a 'no-discharge' bill"); *id.* at 38,834, *1972 Leg.Hist.* 1336 (statement of Sen. Baker) ("Certainly, this bill does not . . . try to eliminate all pollution at this time nor, ideally, even by 1985.").

**70.** S. 2770, 92d Cong., 1st Sess. § 101(a)(1971), *1972 Leg.Hist.* 1535.

**71.** H.R. 11,896, 92d Cong., 2d Sess. § 315(a) (1972), *1972 Leg.Hist.* 1042–43. The House debate is reported in 118 Cong.Rec. 10,201–68, 10,611–73, 10,748–831 (1972), *1972 Leg.Hist.* 343–751. *Compare, e.g., id.* at 10,206, *1972 Leg.Hist.* 355 (statement of Rep. Harsha) (incorrectly reported in *1972 Leg.Hist.* as the statement of Rep. Blatnik) ("the technology for 'no discharge' . . . does not now exist"); *id.* at 10,213, *1972 Leg.Hist.* 375 (statement of Rep.

Clausen) ("no one knows whether or not we *can* meet the 1985 goal of no discharge . . . [or] whether or not we *should* establish the 1985 goal") (emphasis added); *and id.* at 10,799, *1972 Leg.Hist.* 739 (statement of Rep. Crane) ("The House position is that technology is not available to enforce 'zero discharge' without serious disruption of industry.") *with, e.g., id.* at 10,249, *1972 Leg.Hist.* 470 (statement of Rep. Dingell, an unsuccessful sponsor of major "clean water" amendments to strengthen the House bill) ("I, for one, do not believe it necessary for the 92d Congress to defer to the 94th Congress on . . . asking polluters to install and use, nearly a decade from now, the best available technology to treat their wastes."); *and id.* at 10,639, *1972 Leg.Hist.* 516 (statement of Rep. Harrington) ("These are only goals—not a legislative mandate—but they are dates which give us a framework for our efforts.").

be in a position to fully evaluate the implications of a no-discharge policy.

H.R.Rep. at 77, *1972 Leg.Hist.* 764.

In short, while Congress wanted to eliminate pollution if practicable, it realized that it might have to settle for something less.

The legislative history of the 1977 amendments further suggests caution in indiscriminately relying on the § 101(a) "goals" to alter the meaning of specific provisions of the Act. In 1977, Congress reconsidered and modified the general requirement that effluent limits must be based on "best available technology" (BAT) for all pollutant discharges. It recognized that BAT was often not cost-justified for non-toxic pollutants such as oxygen-demanding organic waste. The Senate bill authorized EPA to waive BAT for such pollutants so long as the resulting water quality would still allow "propagation of a balanced, indigenous population of shellfish, fish, and wildlife, and allow[ ] recreational activities." S. 1952, 95th Cong., 2d Sess. sec. 26(a), § 301(d)(5) (1977), *1977 Leg.Hist.* 555, 583. The Senate Report explains that "treatment for the sake of treatment" should not be required:

> Many industrial dischargers have testified that the best practicable technology effluent limitations required in 1977 have provided a high degree of water quality improvement with the result that BAT requires treatment of conventional pollutants not deemed necessary to meet the 1983 water quality goals of the act. The intent of this section is to allow modification of BAT requirements in cases where this may be true. In this way, treatment for the sake of treatment would be prevented.

1977 S.Rep. at 43–44, *1977 Leg.Hist.* 676–77, U.S.Code Cong. & Ad.News at 4368; *see also 1977 Senate Hearings, supra* note 33, at 662, *1977 Leg.Hist.* 1136 (statement of Sen. Muskie) ("the [dissolved oxygen] problem doesn't justify BAT"). As enacted, the 1977 amendments go even further than the Senate proposal, replacing BAT altogether for "conventional" non-toxic pollutants with the weaker requirement of "best conventional pollutant control technology," and permitting waiver of BAT for "nonconventional" nontoxic pollutants. Clean Water Act of 1977, §§ 42–43, 33 U.S.C. § 1311(b)(2)(E), (g); *see also Natural Resources Defense Council, Inc. v. United States Envtl. Protection Agency,* 211 U.S. App.D.C. 179, 656 F.2d 768, 772–74 (1981) (discussing the provisions in the 1977 amendments for waiver of the secondary treatment requirement for some municipal discharges).

The legislative history, then, indicates that Congress' avowed purpose to minimize pollution was not nearly so unequivocal as to make unreasonable EPA's interpretation of the specific provisions of the Act relating to dams. A contrary conclusion would too lightly dismiss Congress' understanding that the zero-discharge goal was "not enforceable," not based on refined cost estimates, and quite possibly "beyond the ability of the American people to absorb the cost."

Moreover, deference to the agency should play a substantial role in our analysis of the subtle and difficult question of how much weight to accord Congress' declared "goals" in inferring its "intent" on a matter that it appears never to have considered. The question is one of the level of generality at which to attribute legislative intent. More specifically, if someone had told Congress that dams cause pollution of reservoirs and that polluted water is released downstream through the dams, would Congress have honored the general anti-pollution mandate of the Act and said "of course we meant to reduce dam-caused pollution as much as possible by requiring NPDES permits"? Or was its "intent" more narrowly focused on specific problem areas, such as industrial and municipal discharges, so that it would have said "wait a minute, we were not thinking about dams, we have to consider separately how best to regulate them"?

There is no sure answer to this question. How broadly we construe the congressional "purpose" will inevitably turn in part on the practical or "policy" conse-

quences of the choice.[72] There is special reason to defer to the agency's policy choices. Contemporaneous construction by the agency should also receive substantial weight because the agency was in a better position in 1973 to decide how broadly to characterize Congress' intent than we are almost a decade later. In this case, EPA's views on dam-induced pollution merit deference as both contemporaneous and infused with its expert evaluation of the seriousness of the problem, the cost of cure, and the effectiveness of state regulation. We think, therefore, that the district court erred in relying on the legislative goals expressed in § 101(a) to invalidate EPA's otherwise reasonable construction of the NPDES permit program as excluding dam-caused pollution.

### 3. Policy Considerations

Finally, as a policy matter (and recognizing our limited role in reviewing agency policy decisions) we are not convinced that EPA's decision to leave dam regulation to the states was so misguided as to frustrate congressional policy. EPA contends that requiring permits for 2,000,000 dams would be an impossible task. Yet, so far as the record shows, most, if not all of the dams that cause water quality problems are large hydroelectric dams. Thus, the number of dams that would require permits is probably no more than the 50,000 "large" dams in the country,[73] and quite possibly only the 3,000 or so dams that are large enough to generate significant amounts of hydroelectric power.[74] That is a manageable number even if it turns out to be impractical to issue categorical permits.[75] Nor are we persuaded by EPA's argument that because the NPDES program requires discharge of pollutants to be eliminated to the extent technologically feasible, it will preclude beneficial dam-caused water changes, such as cold water discharges to support a trout fishery. It should be feasible for EPA to define "pollutant" to exclude beneficial water quality changes.

On the other hand, dam-caused pollution is unique because its severity depends partly on whether other sources have polluted the upstream river. The NPDES program, however, requires EPA to issue nationally uniform standards, and thus would not allow the agency to take full account of the interrelationship between dam-caused pollution and other pollution sources. Moreover, dams are a major component of state water management, providing irrigation, drinking water, flood protection, etc. In light of these complexities, which the NPDES program was not designed to handle, it may well be that state areawide water quality plans are the better regulatory tool.

Also, the severity of dam-caused pollution is highly site-specific. Common forms of NPDES limits (x% reduction in biochemical oxygen demand (BOD) or y pounds of BOD per ton of industrial output) would entail major costs at one dam, and only minor costs at another. Thus, it would be difficult at best for EPA to determine what level of reduction is obtainable by using the "best available technology *economically achievable*" for each "category or class" of polluter. Clean Water Act § 301(b)(2)(A), 33 U.S.C. § 1311(b)(2)(A) (emphasis added). Control that is economically feasible at one site may be infeasible at another.[76] Con-

---

72. See Brest, *The Fundamental Rights Controversy: The Essential Contradictions of Normative Constitutional Scholarship,* 90 Yale L.J. 1063, 1092 (1981) ("choices among the levels of generality on which to articulate principles ... are inherently non-neutral").

73. Joint Statement of Material Facts, *supra* note 4, ¶ 5, J.A. at 26.

74. National Wildlife Federation, *Petition for Rulemaking under the Federal Water Pollution Control Act* 1 (Feb. 28, 1978), J.A. at 117.

75. Cf. *Natural Resources Defense Council, Inc. v. Costle,* 186 U.S.App.D.C. 147, 568 F.2d 1369, 1380–82 (1977) (rejecting EPA claim that it would be infeasible to issue permits for 400,000 agricultural and silvicultural point sources).

76. Control costs will also vary from one industrial plant to another. As Congress recognized in requiring cost-benefit analysis only for each class or category of sources and not for each individual source, some inefficient plants may be forced to close. See *E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 128–33, 97

versely, major expenditures might be required for dams where, say, dissolved oxygen levels are slightly reduced immediately below the dam, but not enough to harm fish, and the river is fully reaerated within a few miles.

Finally, we cannot say, on the record before us, that federal intervention is needed because the states have abdicated their § 208 responsibility over a truly pressing national problem. The record does not show how vigorous state enforcement has been, but at least some efforts have been made to remedy dam-caused pollution.[77] Supersaturation and sediment releases appear to be minor problems. As discussed earlier, temperature changes are not always harmful, are not easily controllable at single-outlet dams, and can apparently be readily controlled at multiple-outlet dams. Low dissolved oxygen and dissolved minerals and nutrients are the most serious problems, but EPA has the authority, when it reviews state water pollution control plans, to insist if need be on stronger efforts in the future. Also, new dams cannot be built unless they comply with state water quality requirements; thus the problem is largely limited to existing dams.[78]

Moreover, if dam-caused pollution was truly of major proportions, someone, be it EPA, the Wildlife Federation, or other environmental groups, would most likely have brought it to Congress' attention, either in 1972 or in 1977. And of course, the Wildlife Federation, if unhappy with our attempt to divine what Congress would have done about dam-caused pollution had it thought

about it, is still free to seek a legislative solution.[79] Unless and until Congress addresses the matter, we cannot say that the Act requires EPA to adopt the strictest possible regulatory solution.

## V. CONCLUSION

 In closing, we emphasize the narrowness of our decision. It is not our function to decide whether EPA's interpretation of the term "discharge of a pollutant" is the best one or even whether it is more reasonable than the Wildlife Federation's interpretation. We hold merely that EPA's interpretation is reasonable, not inconsistent with congressional intent, and entitled to great deference; therefore, it must be upheld. The judgment of the district court is *reversed.*

---

S.Ct. 965, 975–77, 51 L.Ed.2d 204 (1977) (discussing legislative history of § 301). But apparently variation in the cost of pollution control is likely to be less at industrial plants than at dams. Also, one cannot simply shut down an old dam; environmental effects will remain.

**77.** *See* note 9 *supra;* note 78 *infra.*

**78.** See § 401(a)(2), 33 U.S.C. § 1341(a)(2). For example, in constructing Russell Dam, one of the dams at issue in the *South Carolina* litigation, the Corps of Engineers "agreed to meet the State water quality standards" and included in its cost estimate "oxygen injection and a turbine aeration system" to remedy an anticipated low dissolved oxygen problem. *Public Works for Water and Power Development and*

*Energy Research Appropriation Bill, 1978: Hearings Before a Subcomm. of the House Comm. on Appropriations,* 95th Cong., 1st Sess. 90 (1977).

**79.** In 1977, at least, the Environmental Defense Fund was aware of the effects of dams on water quality. *See* Tripp, *Tensions and Conflicts in Federal Pollution Control and Water Resource Policy,* 14 Harv.J.Legis. 225, 254 (1977) (Mr. Tripp was a lawyer for EDF). It chose not to pursue the matter during Congress' 1977 revision of the Act. Interestingly, Mr. Tripp apparently took it for granted in his article that the water quality problems at issue here are nonpoint source pollution.