TRAILWAYS, INC. et al., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Greyhound Lines, Inc. and American Bus
Association, Intervenors.

TRAILWAYS, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Greyhound Lines, Inc., Intervenor.

Nos. 83-1070, 83-1528.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 3, 1983.
Decided Feb. 21, 1984.

Betty Jo Christian, Washington, D.C.,
with whom George W. Hanthorn, Dallas,
Tex., and Robert Lewis Thompson, Wash-
ington, D.C., were on the brief, for peti-
tioners.

Richard J. Osterman, Jr., Atty., I.C.C.,
Washington, D.C., with whom John Broad-
ley, Gen. Counsel, and Lawrence H. Rich-
mond, Deputy Associate Gen. Counsel,
I.C.C., Washington, D.C., and Robert B.
Nicholson and Edward T. Hand, Attys.,
Dept. of Justice, Washington, D.C., were
on the brief, for respondents.

Charles A. Webb, Washington, D.C., was
on the brief for intervenor American Bus
Ass'n.

Robert Ehrenbard and Michael A. Butter-
worth, New York City, were on the brief,
for intervenor Greyhound Lines, Inc.

Before WRIGHT, WILKEY and WALD,
Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

This consolidated proceeding brings before the court two related cases concerning the scope of Section 7 of the Bus Regulatory Reform Act of 1982 (BRRA), Pub.L. No. 97–261, 96 Stat. 1102, 1108, 49 U.S.C.A. § 10922(i)(4) (1983). In No. 83–1070 petitioner Trailways alleges that the Interstate Commerce Commission exceeded its statutory authority in adopting a rule implementing Section 7. In No. 83–1528 Trailways challenges the Commission's first application of its newly-adopted rule. For the reasons that follow we hold that the rule is an appropriate interpretation of Section 7 and therefore affirm in No. 83–1070. However, we vacate a part of the Commission's order applying the rule in No. 83–1528 because that portion of the order exceeded the Commission's statutory authority.

## I. Factual Background

### A. *Bus Route Regulation Before BRRA*

Under the pre-BRRA statute, as re-codified by Congress in 1978, *see* Pub.L. No. 95–473, 92 Stat. 1466, a bus carrier who desired to provide intercity passenger service over regular routes was required to obtain a certificate from the ICC. 49 U.S.C. § 10921 (Supp. V 1981). A carrier could obtain such a certificate if it proved, *inter alia,* that the proposed service was required by the "public convenience and necessity," *id.* § 10922(a)(2). The Commission could issue the certificate only for operations "over a regular route and between specified places." *Id.* § 10922(d)(3). A bus company that obtained a certificated route had the responsibility of maintaining "continuous and adequate" service to all communities listed on the certificate, *see id.* § 11101(b).

This case involves "intermediate point restrictions," which prohibited the carrier from serving some or all intermediate points between the two endpoints of a certificated route. Intermediate point restrictions apparently were imposed as a result of two factors. First, the bus company in making its "public convenience and necessity showing" often had to demonstrate that there was a need for the service it was offering on that route—*i.e.,* that service offered by other carriers was inadequate and that the additional service it offered would not jeopardize the ability of other carriers to continue to offer their services on the route. Because a bus company often could not make the requisite showing for an entire route including destination points and all intermediate stops, it would obtain the certificate only at the cost of including restrictions against serving intermediate points. Second, because a bus company had the responsibility of providing "continuous and adequate" service on its route, the company would seek restrictions on intermediate point service because it did not want to be obligated to serve all possible intermediate points.

As time went on new roads were built, enabling bus companies to offer improved service to the communities on their routes. The statute provided that "[u]nder regulations of the Commission, a motor common carrier may occasionally deviate from the regular routes, or the places specified in the certificate, or both." *Id.* § 10922(d)(2). Under the authority of this provision the Commission established several kinds of "alternative" routes, two of which are relevant for present purposes.

In 1955 the Commission promulgated regulations permitting bus companies to use "deviation routes," which were alternate roads used to service the points for which a carrier already held certificated authority. *See* 49 C.F.R. § 1042.2(c)(9)(i) (1982) (deviation route available where there is "another highway which provides a reasonably direct and practicable route between any two points on [the] regular route"). The carrier could obtain a deviation route by merely filing for authority with the Commission and publishing a notice in the Federal Register. *Id.* The only ground for denying the application was if a protestant showed that the use of the alternate route would "materially change the competitive situation."

*Id.* The purpose of a deviation route was for the carrier's "operating convenience only." *Id.* The Commission issued no certificate for a deviation route, and the grant of a deviation route in what was called a "letter notice" was entirely parasitic on the underlying certificated route: a carrier could operate on a deviation route only so long as it maintained adequate service as specified on its underlying certificate, *id.* § 1042.2(d)(2), and a carrier could not sell, lease, or otherwise sever a given deviation authority from its underlying certificated authority. *Id.* § 1042.2(d)(7).

In 1969 the Commission established another category of new routes to permit bus carriers to take advantage of the rapid completion of the interstate highway system. *Motor Service on Interstate Highways—Passengers,* 110 M.C.C. 514 (1969). The rules governing these "superhighway routes," *see* 49 C.F.R. § 1042.1 (1982), were quite similar to those governing deviation routes. Just as with a deviation route, a carrier could obtain a superhighway route only upon a showing that the route "[would] not materially change the competitive situation" between the applicant and any other carrier. *Id.* § 1042.1(a). For present purposes, there were two differences between superhighway and deviation routes. First, although a deviation route could not include any points not included on the underlying certificated route, a carrier could petition for a superhighway route to serve points that it had not been permitted to serve or that were not even located on the underlying certificated route. Second, the Commission granted certificates for superhighway routes, rather than the letter notice authorities it granted for deviation routes.

## B. *The Current Controversy*

In 1982 Congress passed the BRRA, which was designed to eliminate unnecessary regulation of the bus industry. One of the evils addressed in BRRA was the inefficiency and waste of energy resources caused by intermediate point restrictions. Section 7 of BRRA therefore provided bus

companies an opportunity to have intermediate point restrictions "automatically" removed from its routes via an abbreviated proceeding before the Commission. The carrier had only to file an application for removal and, unless a protestant could show that removal of the restriction would have an adverse impact on commuter bus operations, the Commission was required to grant the application within 90 days. BRRA § 7, 96 STAT. 1108 (1982), 49 U.S.C.A. § 10922(i)(4) (1983).

On September 22, 1982 the Commission issued a notice of proposed rulemaking to implement Section 7. 49 Fed.Reg. 42921 (1982). As finally adopted, the rules permitted a carrier to use a Section 7 proceeding to seek "authority to perform interstate service at all intermediate points along a motor carrier of passenger's [*sic*] existing interstate regular routes *including superhighway and deviation routes.*" *Ex Parte No. MC–142 (Sub-No. 3),* Appendix (App.) at 3, Joint Appendix (JA) 72 (emphasis added) (quoting regulation to be codified at 49 C.F.R. § 1165.31).

The Commission received a number of comments centering on its interpretation of the statute to permit automatic restriction removal from deviation routes. Trailways argued that the rule impermissibly expanded the reach of deregulation envisioned by the statute. Section 7 provided that "the Commission shall * * * remove any operating restriction *imposed on the certificate* in order to authorize interstate transportation to intermediate points on any route *covered by the certificate* * * *.*" 49 U.S.C.A. § 10922(i)(4) (1983) (emphasis added). Trailways' argument was simple: No certificates are issued for deviation routes; therefore no restrictions can be "imposed on" a deviation route certificate and such routes are not "covered by" a certificate; therefore the automatic restriction removal provisions of Section 7 may not be used to remove restrictions on deviation routes. Although Trailways admitted that the language was sufficiently capacious to authorize automatic removal of restrictions on certificated routes (including both regular certificated and superhighway routes),

Trailways believed that the language could not reasonably be read to authorize automatic removal of intermediate point restrictions from deviation routes.

The Commission rejected Trailways' contentions. It justified its action by stating:

> Deviation notices are based on the underlying certificate and are inextricably related to it. They are not severable by sale or otherwise from the underlying certificated authority. * * * [D]espite the fact that deviation notice authority may be in letter form and not actually shown in a carrier's certificate, it is[,] nonetheless, necessarily based on the underlying certificate. Accordingly, we will apply section 10922(i)(4) procedures to passenger carrier routes served via deviation notices. To hold otherwise would be to create an artificial distinction among routes, not required by Congress, and clearly contrary to the overall spirit of the Bus Act which is to eliminate unnecessary and burdensome regulation.

*Ex Parte No. MC–142 (Sub–No. 3), supra,* at 7–8, JA 67–68 (citation omitted).

Pursuant to the newly adopted rule, Greyhound asked the Commission to remove the restriction against serving Little Rock, Arkansas on its deviation route between Texarkana, Texas and Memphis, Tennessee.[1] Greyhound's application indicated only that it wanted restrictions removed from the deviation route. Because deviation routes were granted by letter notice rather than certificate, Greyhound requested only a letter authorizing the restriction removal from its deviation route. *See* Application to Remove an Intermediate Point Restriction, JA 92 (responding to request on application form for a "copy of the proposed certificate" with statement that "notice from the Commission that the application has been granted will be all that is necessary to effect the requested restriction removal"). Trailways, which had already

commenced an action in this court to review the Commission's newly-adopted rule, filed a protest to Greyhound's application. Rejecting Trailways' protest, the Commission not only granted Greyhound's application, but also granted Greyhound a certificate for the deviation route; it did this despite the fact that Greyhound had not asked for the certificate and despite the fact that letter notices, not certificates, were issued as authority for operations on deviation routes. The certificate the Commission issued is in all respects similar to an ordinary certificate issued after a new application for a route, except that it has a notation in the corner reading "Supersedes: No. MC–1515 (Deviation No. 735)." JA 147. Trailways filed a petition for review of the Commission's decision, and Trailways' two cases—one seeking review of the rulemaking, the other seeking review of the adjudication—were consolidated.

## II. ANALYSIS

### A. *Standard of Review*

The Commission suggests that, because the regulation at issue is an agency interpretation of one of its own governing statutes, it is entitled to great judicial deference. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Trailways, on the other hand, argues that courts are the final arbiters of the meaning of statutes, *see FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965); *Office of Communication of United Church of Christ v. FCC,* 707 F.2d 1413, 1424 (D.C.Cir.1983), and that this court therefore must exercise its own judgment as to the meaning of Section 7 of BRRA. The principle urged by the Commission and that advanced by Trailways, though conflicting, are both well-entrenched in the case law. *See Natural Resources Defense Council, Inc. v. USEPA,*

---

1. Greyhound had once before under the old statute sought authority to serve Little Rock on its Texarkana-Memphis route. In the previous proceeding it had successfully obtained a certificate to serve this route, but this court vacated the Commission's order. *See Trailways, Inc. v.*

*ICC,* 673 F.2d 514 (D.C.Cir.), *cert. denied,* 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982). Because that case was decided under the old statute and in a different type of proceeding, its relevance in the current situation is limited.

725 F.2d 761 (D.C.Cir.1984). But neither principle as formulated is sufficiently sensitive to the salient differences among situations in which a reviewing court must evaluate an agency interpretation of its governing statute.

■ Although a totally satisfactory and easily-applicable reconciliation of the two principles may be impossible, the framework for analysis is sufficiently clear. When a court reviews an agency interpretation of its governing statute, the first question is whether Congress delegated to the agency the task of elaborating the norm in question. *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 167 (D.C.Cir.1982); *Process Gas Consumers Group v. U.S. Dep't of Agriculture,* 694 F.2d 778, 791 (D.C.Cir. 1982) *(en banc), cert. denied,* —— U.S. ——, 103 S.Ct. 1874, 76 L.Ed.2d 807 (1983). If Congress has delegated to an agency the task of elaborating the meaning of a statutory directive, a reviewing court must accept the agency interpretation if it is not arbitrary or capricious. *See NLRB v. Hearst Publications,* 322 U.S. 111, 126–127, 64 S.Ct. 851, 858, 859, 88 L.Ed. 1170 (1944). It remains for the reviewing court in the first instance to exercise its responsibility to interpret the statute to determine whether Congress delegated the norm-elaboration function to the agency. *Cf. Global Van Lines, Inc. v. ICC,* 714 F.2d 1290, 1296–1297 (5th Cir.1983).

■ The issue in this case is the scope of deregulation: whether Section 7 of BRRA, which essentially deregulates the ability of bus companies to stop at intermediate points, applies to deviation routes as well as certified routes. We find no reason to believe that Congress intended to delegate to the Commission any particular responsibility to determine the scope of deregulation in the bus industry. None of the usual indicia of congressional intent to delegate, such as the use of broad "public interest" criteria, the presence of an established administrative practice when the statute was enacted, or specific references in the statute or legislative history, are present in this case. *Cf.*

*National Wildlife Federation v. Gorsuch, supra,* 693 F.2d at 167. In fact, all evidence indicates that Congress thought it was delineating for itself the scope of deregulation, which was the primary issue it faced in considering BRRA. *See, e.g.,* 128 Cong.Rec. S7709 (daily ed. June 30, 1982) (stating that the bill would "provide an appropriate balance between the need for increased competition in the industry and the need to insure service in all parts of the country"); 127 Cong.Rec. H8585 (daily ed. Nov. 19, 1981) (statement of Rep. Howard) ("This bill * * is regulatory reform and not total deregulation."); *id.* at H8587 (statement of Rep. Clausen).

Given Congress' focus on the extent of deregulation and on the precise structure of the new regulatory scheme, we do not believe that Congress intended to delegate to the Commission any significant responsibility to decide the bounds of its own power in deregulating the industry. This is not to say that BRRA did not delegate any significant power to the Commission, for Congress clearly did intend that the Commission should have significant discretion, for instance, to make particular public interest and other determinations under specific provisions of the statute. But because this case raises issues concerning the scope of deregulation and the structure of the regulatory scheme for which there is no evidence of intended congressional delegation to the Commission, we believe that it is for the courts to resolve questions about the content of the decisions Congress made. Although the agency's opinion on this point is useful, we do not accord it controlling weight.

B. *Interpreting the Statute in This Case*

■ 1. *The Statutory Language.* Section 7 of BRRA states that "the Commission shall * * * remove any operating restriction imposed on the certificate in order to authorize interstate transportation to intermediate points on any route covered by the certificate * * *." 49 U.S.C.A. § 10922(i)(4) (1983). As stated above, Trail-

ways' major argument is that the "plain meaning" of the statute limits the restriction removal provision to cases in which the restriction was "imposed on the certificate" and therefore excludes uncertificated deviation routes from its scope. Trailways is correct in its reliance on the statutory language, insofar as the words of the statute do create the issue in this case: without the specific references to certificates, Trailways would have no ground on which to argue that deviation routes are not covered by Section 7. However, we do not believe that the "plain meaning" rule—if dispositive in any seriously contested case, see *Natural Resources Defense Council, Inc. v. USEPA, supra,* 725 F.2d 761, at 768 ("Absent consideration of context, the plain meaning rule becomes merely a rorschach onto which judges cast their own conflicting visions of what statutory words *ought* to mean.") (emphasis in original)—can resolve the issues before us, for the Commission points out that deviation routes can include only those stops permitted on the underlying certificated route, and that, in this sense, intermediate point restrictions on deviation routes *are* "imposed on the certificate," *i.e.,* the underlying certificate. In the same sense, a deviation route is "covered by the certificate."

If we were forced to decide this case solely on the basis of the words of the statute, we would perhaps be inclined to agree with Trailways. But we need not confine our inquiry to the words of the statute. Rather, in construing this statute we must look at other indicia of congressional purpose. Relevant portions of the legislative history are unhelpful in revealing what meaning Congress intended to give to the words in Section 7, in that they tend merely to repeat the statutory language. *See, e.g.,* S.Rep. No. 411, 97th Cong., 2d Sess. 20 (1982); H.R.Rep. No. 780, 97th Cong., 2d Sess. 40 (1982). We therefore must resolve this case by determining which construction of the statute best effectuates Congress' purposes and contributes to (or at least does not detract from) the articulation of a coherent system of bus regulation.

2. *The Post-BRRA System of Regulation.* There are two ways for a carrier to extend its service to a new community. Section 6 of BRRA is the general entry provision of BRRA governing authorization for new service. *See* 96 STAT. 1104, 49 U.S.C.A. § 10922(c)(1)(A) (1983). A carrier seeking authority to institute new service under Section 6 must, as under the old statute, apply for a certificate. The standard governing grant of a Section 6 application is whether the new service is "consistent with the public interest." *Id.* This standard replaces the more stringent "public convenience and necessity" standard of the old statute. In addition, Section 6 shifts the burden of proof from the applicant, who had the burden under the old statute, to the protestant. Nonetheless, despite the fact that Section 6 thus relaxes the requirements for obtaining a new certificate, it retains the need for the Commission—at least in the case of a contested application—to make a public interest determination.

The Section 7 restriction removal provision is an alternative means for a carrier to gain authority to provide new service. To be sure, it is available only if the new service sought is to intermediate points on an already-existing route. But, as noted above, it permits the carrier to institute such new service "automatically" in an expedited proceeding. Most importantly, the Section 7 procedure allows no opportunity for the Commission to reject an application as not in the public interest.

The question in this case is whether the entry provisions of Section 6 or the restriction removal provisions of Section 7 should govern a carrier's attempt to establish a new service connecting intermediate points that the carrier previously was unable to serve along a deviation route. Section 6 embodies Congress' determination that a public interest inquiry (at the request of a protestant) should in general be a prerequisite to permitting a bus carrier to institute new service. Section 7 embodies a judgment that (at least with respect to certificated routes), if a carrier is already serving a

given route, the carrier should be permitted to serve any intermediate points along that route at its discretion and without the need for the Commission to make a public interest determination. Because Section 7 thus amounts to a statutorily authorized means for a carrier to circumvent Section 6's public interest determination, its provisions are functionally equivalent to a judgment that it will always be in the public interest for a carrier to be permitted to make intermediate stops along a route it is already serving. Underlying this judgment is a principle that the energy conservation and efficiency gained by permitting intermediate stops on certificated routes will usually outweigh any detriments—such as competitive harm suffered by competing carriers—that new service to intermediate points could cause.

The parties agree that regular certificated and superhighway routes are included within the routes eligible for automatic restriction removal under Section 7. We must decide whether there is any difference between these certificated routes and deviation routes such that, given its purposes as outlined above, Section 7 applies more readily to the former than to the latter.

We find most of the arguments advanced by Trailways in support of such differences to be unconvincing. Trailways argues that deviation routes differ from certificated routes in the following respect: When a carrier receives authorization to serve a deviation route, that authorization cannot add new points to the carrier's service. When a carrier receives certificated authorization—either regular certificated or superhighway—the carrier often or always receives authority to serve new points. But, although we agree that deviation routes are different in this respect from certificated routes, we fail to see the relevance of the difference for the issue in this case. The issue in this case is whether, *aside from the points already authorized,* the carrier may add new points without undergoing the Section 6 entry procedures. The fact that the Commission previously authorized service to a particular point—whether that authorization resulted from a full-blown proceeding for a regular certificate or from a signifi-

cantly relaxed superhighway proceeding—has no relevance to the question whether the carrier can add a *different* new point automatically (under Section 7) or only after a public interest determination (under the entry provisions of Section 6). The mere fact that superhighway routes are different in this respect from deviation routes is insufficient to demonstrate that the statutory scheme would be advanced if superhighway routes were included in and deviation routes excluded from the scope of Section 7.

To hold that Section 7 proceedings may not be used to remove restrictions from deviation routes would in fact require us to hold that Congress had drawn a rather bizarre line in the statute. One part of Section 6 of the statute permits the Commission to issue a certificate to a carrier authorizing intrastate transportation with no restrictions if such transportation "is to be provided on a route *over which the carrier has authority on the effective date of this subsection to provide interstate transportation* of passengers * * *." 49 U.S.C.A. § 10922(c)(2)(A) (1983) (emphasis added). This provision permits the Commission to withdraw intermediate point restrictions from *all* intrastate routes that are segments of interstate routes, regardless of whether the interstate route is a regular certificated, superhighway, or deviation route. The purpose of this provision was to permit the Commission to preempt the duplicative, wasteful, and short-sighted state regulation of intrastate carriers. *See, e.g.,* S.Rep. No. 411, 97th Cong., 2d Sess. 7–14 (1982); H.R. Rep. No. 334, 97th Cong., 1st Sess. 24–37 (1981). Trailways suggests that the difference between the broad language used in this provision of Section 6 ("a route over which the carrier has authority") and the narrower discussion of routes "covered by the certificate" in Section 7 indicates that Congress intended broader restriction removal in the Section 6 intrastate context than in the Section 7 interstate context. Trailways' argument is that Congress knew perfectly well how to draft a provision that

would include deviation routes and the fact that Congress did not use this broad language in Section 7 should be read to mean that Congress intended to exclude deviation routes from Section 7 procedures.

We believe that, contrary to Trailways' argument, the terms of Section 6 support the Commission's interpretation of the statute. Trailways' argument presupposes that Congress wanted to distinguish between intrastate restriction removal and interstate restriction removal. But neither the parties, the legislative history, nor our own imagination has been able to produce any reason why Congress would have wanted to make such a distinction. Rather, Section 6 merely reinforces our belief that Congress made a judgment—embodied both in this part of Section 6 and in Section 7—that a carrier should be able to remove intermediate point restrictions from any route over which it is authorized to provide service. Trailways' argument requires that we imagine that Congress had some unknown reason for including deviation routes in the Section 6 intrastate restriction removal provision while excluding them from the Section 7 interstate restriction removal provision. We find instead that Congress' resolution of the Section 6 problem by including *all* of a carrier's routes suggests that Congress intended to resolve the similar problem of Section 7 in the same way.[2]

We do have two grounds for genuine concern about the Commission's rule. First, if the rule is interpreted to permit automatic restriction removal from deviation routes

not in existence at the time BRRA was passed, significant mischief could be done to the regulatory scheme. A carrier that wanted to serve a new point could in that case apply for a deviation route that would go through that point and then move for removal of restrictions on the new deviation route. The carrier would thus circumvent the entry provisions of Section 6 without advancing the efficiency and energy conservation rationales underlying Section 7. This possible circumvention of the statute was not raised by the facts of this case, nor was it briefed or discussed by the parties. We therefore express no opinion as to whether the Commission's regulation may validly be read to permit automatic removal of restrictions from deviation routes not in existence at the time the statute was enacted.[3]

Another, related, ground for concern is advanced by Trailways. As we mentioned above, *see* pages 1285–1286 *supra*, a deviation route under the Commission's rules is totally parasitic on its underlying certificated route; authority to use the deviation route continues only for so long as the carrier continues to supply "reasonable and adequate" service over the underlying certificated route. *See* 49 C.F.R. § 1042.2 (d)(2) (1982). Trailways points out that the Commission has evidently interpreted its rule not merely to permit a carrier to automatically remove restrictions from a deviation route, but also to gain a certificate for the former deviation route in the process. If a carrier can auto-

---

2. It is important that the focus of our criticism of Trailways' arguments should be clear. Congress could perfectly well decide to permit automatic restriction removal on intrastate, but not interstate, deviation routes. By the same token, Congress could decide to permit automatic restriction removal on superhighway, but not deviation, routes. Although these distinctions would be difficult to justify when considered in isolation, they could perhaps be justified by a desire to pass some deregulatory legislation in the face of significant opposition or a desire to afford some protection to competing bus companies. Our point, however, is that we are unable to find any evidence that Congress in fact *did* decide to draw these particular distinctions. Under the circumstances, the statutory structure should be articulated in

a way that minimizes—rather than maximizes—the arbitrariness of the distinctions that are made. *Cf.* Note, *Intent, Clear Statements, and the Common Law,* 95 HARV.L.REV. 892, 906–907 (1982).

3. We note that the *intrastate* restriction removal provisions of § 6 discussed above permit the Commission to remove restrictions only from routes "over which the carrier has authority *on the effective date of this subsection.*" 49 U.S. C.A. § 10922(c)(2)(A) (1983) (emphasis added). The question we are reserving is whether § 7's restriction removal provision is similarly applicable only to routes over which the carrier had authority on BRRA's effective date.

matically gain a certificate for what was a deviation route, it could take a certificated route it no longer wants to serve, apply for restriction removal from an associated deviation route, gain a certificate for the deviation route, and then cease service on the underlying certificated route. The carrier would perhaps then face the Commission's sanction for ceasing service on the underlying certificated route, but that sanction seems to be merely the revocation of the authority to serve the underlying route. *See, e.g., Pennsylvania Greyhound Lines, Inc. v. American Buslines, Inc.,* 52 M.C.C. 117 (1950); *Towns of Bristol and Hill v. Boston & M. Transp. Co.,* 20 M.C.C. 581, 586 (1939). At any rate, the carrier would have parlayed a certificate it no longer wants for a new certificate (covering the deviation route) that it *does* want.[4] The incentive system associated with deviation routes, which permits carriers to use such routes for their own operating convenience only so long as they continue to serve the underlying certificated route, would be rendered nugatory. Moreover, Section 7's purposes are advanced most clearly in cases in which the carrier seeks to *add* service to a route it is already serving; we would hesitate to interpret Section 7 to enable a carrier to *substitute* a desired service for an unwanted one without having to use the entry provisions of Section 6. Therefore, if the Commission's rule would permit the kind of end-run around the statutory scheme outlined above, we would be inclined to reverse it.

Although we thus find some merit to Trailways' argument, we do not believe that the argument supports vacating the Commission's rule, the result that Trailways desires. For the evil suggested by the argument is not a result of the Commission's rule, but of the Commission's grant of a *certificate* to Greyhound in the adjudication that followed the rule. Not only is there nothing in the rule that requires the Commission to grant a certificate for a previously uncertificated deviation route when it removes intermediate point restrictions, but no one seems to have believed that either Section 7 or the Commission's rule authorized the grant of a certificate for a deviation route until the Commission in fact issued the certificate in this case. Greyhound had sought merely to have restrictions removed from its deviation route by means of letter notice authority, and seems to have had no idea that the Commission would issue it a certificate or in any way change the uncertificated status of its deviation route as a result of its application. *See* Application to Remove an Intermediate Point Restriction, JA 92 ("notice from the Commission that the application has been granted will be all that is necessary to effect the requested restriction removal").

The Commission's issuance of the certificate in this case may thus frustrate the statutory scheme. However, the blame for the frustration is properly pinned not on the Commission's rule, which is itself unexceptionable, but on the Commission's action in granting the certificate—in addition to merely removing the restriction via a letter notice—to Greyhound in this case. Under

---

4. This end-run around the regulatory scheme would permit the carrier to contravene a primary concern of the congressional sponsors of BRRA—continuation of service to smaller communities. *See, e.g.,* 128 Cong.Rec. S7709–7710 (daily ed. June 30, 1983) (statement of Sen. Riegle); *id.* S7712–7717 (Senate debate about service to small communities); *id.* H8590–8594 (House debate about service to small communities); 49 U.S.C.A. § 10922(c)(3)(C) (1983) (noting that Commission, in making public interest determinations, shall consider "the effect of issuance of the certificate on motor carrier of passenger service to small communities"). In general, it is smaller communities that will often be located on the older certificated routes and that may therefore lose service as a result

of the practice outlined in text. If the Commission's rule permitted this practice, it would present not a simple carrying-out of the Commission's purpose in removing intermediate-point restrictions, but a conflict between that goal and the concurrent one of maintaining service to smaller communities. Moreover, if the certificate be taken to provide full certificated authority in accordance with the Commission's rules, this circumvention of the statute may well make hash of other elements of the regulatory scheme. *See* 49 C.F.R. § 1042.-2(d)(7) (1982) ("Operations over approved deviation routes shall not be severable by sale or otherwise from the underlying certificated authority * * *.").

these circumstances, we find that, rather than vacating the Commission's rule, we may address the problem urged upon us by vacating instead the result reached in the adjudication insofar as that result involved issuance of a certificate to Greyhound.

The Commission suggested in oral argument that the specific objection urged here is not open to Trailways because it did not raise this objection before the Commission. When a party withholds an objection from the Commission, we will not ordinarily hear the party urge the same objection before us when the party tries to overturn the Commission's action. In this case, however, the entire argument before the Commission in both the rulemaking and the adjudication centered on the significance of a certificate, the effects of issuance of a certificate, the uncertificated status of a deviation route, and the relation between the restriction removal rules and the carrier's obtaining certificated routes. Although the adjudicatory proceeding did not provide Trailways with opportunity for oral argument and Trailways' submission was brief, we find that the objection we rely on was sufficiently present to be preserved for appellate review.

### III. CONCLUSION

For the reasons outlined above, we express no opinion as to the application of the Commission's rule to deviation routes not in existence at the time BRRA was enacted, but affirm the Commission's result in No. 83–1070, the rulemaking proceeding, in all other respects. As the Commission itself wrote, to exclude deviation routes from the automatic restriction removal proceedings of Section 7 would be to "create an artificial distinction among routes, not required by Congress * * *." *Ex Parte No. MC–142 (Sub-No. 3), supra,* at 7, JA 68. We find that when the statutory scheme is articulated in a way that creates a reasonable framework for regulation, the distinction between deviation routes and other certificated routes is a distinction without a difference. We also affirm the Commission's result in No. 83–1528, the adjudication, ex-

cept insofar as the Commission granted Greyhound a certificate as the result of the proceeding. In all other respects, we leave the result in the adjudication unchanged.

*Affirmed in part and vacated in part.*